IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

UNITED STATES OF AMERICA     :   CRIMINAL ACTION NO.
                             :   2:19-cr-00478
    v.                       :
                             :
JEFFREY COOLEY               :   SENTENCING

_____

James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, PA 19106
January 16, 2020
Commencing at 12:33 p.m.

_____

BEFORE THE HONORABLE JOSHUA D. WOLSON

_____

APPEARANCES:

        U.S. ATTORNEY'S OFFICE
        BY:  PATRICK JOSEPH MURRAY, ESQUIRE
        BY:  JENNIFER A. WILLIAMS, ESQUIRE
        One Independence Mall - Suite 1250
        615 Chestnut Street
        Philadelphia, Pennsylvania 19106
        (215) 861-8474
        patrick.j.murray@usdoj.gov
        jennifer.a.williams@usdoj.gov
        Representing the United States of America

- - -

Ann Marie Mitchell, CRR, RDR, RMR
Official Court Reporter
(267) 299-7250

Proceedings taken stenographically and prepared utilizing
computer-aided transcription

APPEARANCES CONTINUED:

BACHNER & ASSOCIATES PC
BY:  MICHAEL F. BACHNER, ESQUIRE
39 Broadway
Suite 1610
New York, New York 10006
(212) 344-7778
mb@bhlawfirm.com
Representing the Defendant

- - -

(Court called to order at 12:33 p.m.)

THE COURT: Good afternoon everybody. Please be seated.

RESPONSE: Good afternoon, Your Honor.

THE COURT: We are here for United States v. Cooley. It is 19-478.

And so let me just start and I'll take appearances of counsel.

MR. MURRAY: Your Honor, Patrick Murray for the government with Jennifer Williams of the US Attorney's office as well.

THE COURT: Good afternoon.

MR. BACHNER: Good afternoon, Your Honor. Michael Bachner on behalf of Mr. Cooley. Mr. Cooley is seated to my right.

THE COURT: Good afternoon, Mr. Bachner. Good afternoon, Mr. Cooley.

And for the record, we have Ms. Santella here from probation. Good afternoon.

And then I gather Agent Schnatz is on his way. Is that what I heard?

MR. MURRAY: My understanding is he is, Your Honor.

THE COURT: Unless you guys have an objection, we can go forward.

MR. MURRAY: We're happy to proceed. I apologize in

advance if he comes in late.

THE COURT: That's fine. It happens to everybody. I don't think he's integral for this proceeding, so I think it's fine.

MR. MURRAY: No.

THE COURT: Mr. Cooley, I assume you understand why we're here today?

THE DEFENDANT: Yes, I do.

THE COURT: And from your perspective, sir -- yeah, although I'm not going to hear from you much now so it's not a big deal.

From your perspective, Mr. Cooley, any reason not to go forward today?

THE DEFENDANT: No, sir.

THE COURT: You feel okay, a clear mind?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So you can be seated.

I'm going to ask counsel, I'll start with the government, you got a copy of the presentence investigation report I think with its revisions dated January 7, 2020?

MR. MURRAY: Yes, Your Honor.

THE COURT: Mr. Bachner, you got one as well?

MR. BACHNER: I do, Your Honor.

THE COURT: So Mr. Cooley, did you get a copy of that report and have a chance to review it?

THE DEFENDANT: I did, Your Honor.

THE COURT: Okay. And did you get -- why don't you tell me this: How many times have you had a chance to read it?

THE DEFENDANT: Three, four times.

THE COURT: Okay. And you had a chance to go through it with Mr. Bachner?

THE DEFENDANT: Yes.

THE COURT: Anything -- well, have you gotten all the questions you had about the report answered?

THE DEFENDANT: Yes.

THE COURT: Anything you need to discuss at this point, do you need more time to discuss it with Mr. Bachner or anybody?

THE DEFENDANT: I don't believe so, Your Honor.

THE COURT: Is there anything in the report that you saw that you think is incorrect that you at this point think needs to be changed?

THE DEFENDANT: No, Your Honor.

THE COURT: Anything that you think needs to be added that you think would be helpful for your position?

THE DEFENDANT: I think it's good as it is, Your Honor.

THE COURT: Great. You can be seated.

A couple technical things to go over with the lawyers as far as our guidelines calculations.

So I'll sort of ask generally, and I'll go government and then you, Mr. Bachner, just so we keep a clean record.

The total offense level calculated in the presentence report is 13. And my reading was it was a base offense level of 14, a two-point enhancement for sophisticated means, and then a two-point reduction for acceptance of responsibility and a third point as well.

Mr. Murray, is the government in agreement with that?

MR. MURRAY: The government is in agreement with that, Your Honor, yes.

THE COURT: Mr. Bachner, you are in agreement?

MR. BACHNER: We are, Your Honor.

THE COURT: Just as a technical matter, I think, Mr. Murray, that the guidelines technically require a motion from the government to get that third point downward departure, at least on its face.

Am I getting that motion from the government?

MR. MURRAY: Yes. Yes, Your Honor. The government has no objection to that and thinks that the guideline calculation of 13 is accurate, resulting with a criminal history category of 1, a range of 12 to 18 months in Zone C of the sentencing table.

THE COURT: Okay. So let me just -- just for clarity on the record, I'll grant the motion, so we'll get the third point and wind up with a base offense level of 13.

So Mr. Bachner, I think you said you're in agreement with the 13?

MR. BACHNER: We are, Your Honor.

THE COURT: Not base offense level but a total offense level of 13.

Criminal history, I thought that -- and maybe I misheard you, Mr. Murray. I thought probation in the report had concluded that there was a criminal history score of 0?

MR. MURRAY: Yes, Your Honor. Sorry. Forgive me for moving too quickly, Your Honor.

THE COURT: Criminal history category of 1.

MR. MURRAY: Yes exactly. Criminal history category of 0 because of no priors. As a result, the category is 1, putting the defendant in Zone C.

THE COURT: Right. Mr. Bachner, you're in agreement that we have a criminal history score of 0?

MR. BACHNER: Yes, sir.

THE COURT: And so agreement then that we have a guidelines recommended sentence of 12 to 18 months in Zone C, Mr. Murray?

MR. MURRAY: Yes, Your Honor.

THE COURT: Mr. Bachner?

MR. BACHNER: Yes, Your Honor.

THE COURT: Okay. Let's start with the government.

Any objections to the presentence investigation

report?

MR. MURRAY: No, Your Honor.

THE COURT: Mr. Bachner?

MR. BACHNER: No, Your Honor.

THE COURT: All right. So I just want to -- one thing I do want to cover from there, just to make sure it's on the record because I think I've been reminded from the Court of Appeals that we need to make sure this is put on the record, which is the amount of restitution.

I believe the report calculated it at $89,600.

Government is in agreement with that figure, Mr. Murray?

MR. MURRAY: Yes. I just wanted to look at the report and confirm that's the number.

THE COURT: Take your time.

MR. MURRAY: And it is the number, Your Honor. We have no objection to it.

THE COURT: Mr. Bachner, you're in agreement as well?

MR. BACHNER: Yes, Your Honor. All paid.

THE COURT: Yes. So I'm going to hear from the parties.

One thing I do want to flag for you, certainly, Mr. Murray, I assume you've seen the sentencing memorandum that the defendant submitted and certainly I'm going to hear from them and I'm going to consider the request for a downward

variance.

I want everyone to know I'm also at least -- I haven't made up my mind, but I'm contemplating an upward departure as to the fine. And so I just want everyone to sort of be aware of that and have an opportunity to address it as they make their presentations.

So Mr. Murray, I'll hear from you first.

MR. MURRAY: If I could just deal with one preliminary matter, Your Honor. There's been no motions, but I know that one thing that the courts want to do is just confirm that there's no motions for departure. So the government is making no motions for departure.

THE COURT: I appreciate that.

MR. MURRAY: But then, Your Honor, if I may move on to the 3553(a) factors.

THE COURT: Please.

MR. MURRAY: The government's position here is that a sentence within the guideline range of 12 to 18 months would be warranted. You know, as the Court's familiar with the government's sentencing memorandum, the Supreme Court has spoken with respect to this point, talking about how the guidelines should be a starting point and an initial benchmark and that in the usual sentencing, imposing a sentence within the range is usually appropriate. And it's referred to the guidelines as a lodestone of sentencing. But I think that's

true here when the Court looks at these.

Now, the one factor and one of the primary factors is the nature and circumstances of the offense. That's obviously why we're here. And we've addressed it in our memorandum, but this is a tax crime. And it's a serious tax crime, where the defendant has pled guilty to essentially lying to the IRS, willfully submitting a false tax return to the IRS. And in addition, he had -- his conduct, the relevant conduct, essentially involved stealing from the taxpayers of the United States. And that is serious conduct and why we're here today. We're here in federal court. And the government submits it deserves meaningful punishment, meaningful with respect to this defendant.

In addition, the -- another factor as we go down the list is the history of the defendant. And the defendant has submitted a lengthy memorandum with a lot of letters and provided a lot of history. And the government doesn't dispute any of that, but what the defense memo makes clear is that among the various good acts this defendant has done and the long work history he has, he's also had every opportunity in life. You know, he's had a great family, he's had a phenomenal career, a tight network of friends and associates, and he has obviously lots of resources.

What's not addressed here and perhaps, you know, will come out here, is, why did this defendant commit this crime? I

mean, that's ultimately the question here. What was going on here? Why did this defendant open a Swiss bank account to receive distributions from his off-shore trust company? Why did he go up to -- from Ohio, go up to Canada to an ATM and make cash withdrawals from that account? And why did he, when he had a chance to declare his ownership in 2013 of this off-shore entity, did he end up not giving the correct date in 2005 but give one in -- give a date of December 31, 2011?

And that question is not answered. But I submit, Your Honor, the reason is, it's certainly a different reason than most defendants that are in this courthouse. You know, many of the defendants are out here, engaging in their crimes because of financial need. And that's not the case for Mr. Cooley here, and that's a relevant fact to take into account.

In addition, Your Honor, there's the issue of deterrence. And I sort of bring this up in the list because it's so important in this case.

Now, defense counsel has argued that specific deterrence is not a major factor here. And there's -- you know, that may be right, but what clearly is important here, what's perhaps of primary importance, is general deterrence. We've seen from the letters and the defendant's sentencing memorandum that he is a prominent member of his community in Ohio, and I think, frankly, he's a prominent member of the community throughout the United States from his position, his

leadership positions in the various corporations that he's been a part of. He's clearly somebody who knows many people.

He's also -- this sentencing is clearly a court proceeding that others are watching. And when others are tempted to engage in the type of conduct that the defendant did and break the tax laws, if there is a meaningful sentence in this case, it will hopefully delay them or give them pause before they decide to do that. And obviously on the flip side, if there's not a meaningful sentence and they see that, that would undermine deterrence.

THE COURT: So if the crime is economic -- I mean, this is -- you said it's theft. It's taking money from taxpayers. Is a financial penalty deterrent or is it not here?

MR. MURRAY: I don't think it's of sufficient deterrence, Your Honor.

THE COURT: Why not?

MR. MURRAY: I think, you know, having some type of confinement here, whether it's imprisonment or home. There are options if the Court decides to vary. Our position ultimately is varying down to Zone A, to probation, would be inappropriate here, that some type of confinement is warranted and necessary here.

The defendant here has -- he's no doubt, as we've seen from the letters -- and understandably been shamed by this occurrence. And that's understandable and that's real, but

that's not sufficient.

In part, he has developed this broad network of individuals and respect, and there's shame that goes with it. But I think our -- the government's fear is if that's -- if probation and that shame is all that is the eventual sentence, that's going to send the wrong messages to people who are CEOs, former CEOs, prominent businesspeople who engage in this type of theft. A fine -- the defendant, you know, has extremely substantial resources to pay any fine.

The defendant has paid restitution. And we appreciate that. But I would submit to the Court, that's slightly less meaningful than in another case where somebody is of limited means, for example, a pizza store owner, you know, owes $90,000 and they have to, you know, empty out half of their bank account to pay that $90,000 at sentencing. That's one situation. The situation here is something different. So we give the defendant credit for that, but it's a different credit than paying that same amount for another individual.

But, you know, deterrence here is particularly meaningful. And as the Court is aware, the Court needs to consider the policy statements.

And at the beginning of the introductory commentary to 2T1.1 in the sentencing guidelines, there's a number of quotes that are relevant that talk specifically about deterrence and its importance in tax cases. It says: Because of the limited

number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying any of these guidelines.

It goes on to say: Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

And that's why we think it is significant here. The defense has suggested that deterrence really can be served with a sentence of probation here. And I think there was something to the effect of that -- that the research shows that prison would be inappropriate here. And I submit the law or the research that's cited is not directly applicable here.

There is law, which I guess from a common sense perspective -- or not law, sorry. Research, Your Honor, from a common sense perspective, I question that harsh sentences versus lesser sentences don't really matter from a deterrence perspective. Whether somebody gets 20 years or 5 years doesn't matter, it's the certainty of the punishment. There is that research out there.

But that's not what our situation is here. It's whether somebody is going to have to deal with confinement or probation. And as a result, the research that's cited doesn't really apply. I mean, if it wasn't such a -- if imprisonment or confinement of some degree wasn't important here, wasn't a

deterrent, the defense would not be arguing so strenuously for probation. I think we understand that some type of confinement is meaningful. And in a case like this, without it, I am concerned that there would not be sufficient deterrence.

THE COURT: I'm not sure I follow that last point. I mean, the defense's argument about confinement I don't think has to do -- I think you started out by saying, the deterrence we're talking about is general deterrence.

MR. MURRAY: Yes.

THE COURT: My assumption is defense is not here talking about society or societal policy. They're here thinking about Mr. Cooley. And so I'm not sure I understand the notion that, you know, they're fighting tooth and nail out of a concern about deterrence. I think that, you know, if everyone here is largely in agreement that this particular defendant is not at risk of recidivism, then what they're fighting about is sort of individual circumstance and not general deterrence. Doesn't that seem right?

MR. MURRAY: I'm not sure I agree with you, Your Honor. I think that there's -- when we talk about deterrence in terms of sentencing, we need to talk about specific deterrence to this defendant, and the Court needs to consider general deterrence as a result of the sentence here.

And I understand that the defense is certainly more concerned regarding the specific circumstances here, but some

of the points I believe that were made in the sentencing memorandum are about general deterrence. There's research that was cited that go to general deterrence.

THE COURT: No doubt that there is research, you know, the notion that the risk of getting caught is a higher deterrent than the sentence that's imposed. And I understand all that. And I understand that you're taking issue with that. I'm just not sure that that's what -- I mean, they're making their case because they think it might persuade me, you know, to help out Mr. Cooley, yes, not because they have certainty societally about what is and isn't generally deterrent.

MR. MURRAY: Correct, Your Honor. And I don't disagree with that. My only point is the research that underlied their point was addressing something different than their point. The point was that probation -- I think the point was there's no difference for deterrence purposes between confinement and probation, while the research that was being cited I believe was talking about the length of the sentence. And that's just the distinction that I was making.

THE COURT: Understood. Okay.

MR. MURRAY: And then, Your Honor, we've already talked about restitution. So the other point that I wanted to make sure I addressed was -- several other points.

With respect to medical care. It's just something that I think talking on behalf of the government I wanted to

address.

So I appreciate that the defendant has medical conditions that need to be addressed. I do take issue with the statements about the ability of the Bureau of Prisons to provide him with the necessary care. I appreciate that the defendant because of his resources is likely -- has some very high-end care available. And I don't think I could fairly represent that the BOP would be able to exactly match that care. But I do know from my experience and talking to others and from the BOP that the BOP is able to provide more than just the bare minimum of care that's referenced there and that the BOP in frequent cases that I'm familiar -- this is anecdotally from my peers -- is able in some cases to provide better care than might be available because they're affiliated with teaching hospitals and so forth.

There are several research or pieces or articles citing failures of the BOP. And I would only point out that as the Court is well aware, many medical institutions have failures in their systems, you know, along the way, and I don't think that the criticism of the Bureau of Prisons' medical system here is fair and I think that adequate care could be provided to Mr. Cooley.

In addition, there's a point that's made with respect to the fact that if Mr. Cooley was imprisoned, then the hospital facilities are not available at the camps and the

minimum security facilities.

Now, one, I guess one, is we don't know that Mr. Cooley would need to go to a hospital facility. But those facilities are also, even though those facilities are at locations where there might be, you know, maximum security, there are different levels of securities on those campuses. So it's not that Mr. Cooley would necessarily be in a maximum security environment.

But the last point was even if the Court were not inclined to imprison Mr. Cooley, this issue would certainly be addressed by the other confinement possibilities, you know, home confinement or community confinement, and then this issue will I think virtually completely disappear.

Yes?

THE COURT: Maybe you're about to get it to it, but there's an issue that's raised in the defense memo about sentencing disparities.

MR. MURRAY: That was the next thing I wanted to address, Your Honor.

THE COURT: All right. So go ahead.

MR. MURRAY: Thanks for anticipating there.

The point that I have to make there -- and we have not done our own, you know, statistical analysis with respect to it. But I think the point that's important here is there's a lot of comparison that has been done by the consultants that

have been retained by the defendant. But what's important is comparing this defendant to similarly situated defendants as opposed to the vast array of people in the system.

I haven't seen a single example in defense memorandum identifying some other case that is similar to this. There are other cases with a similar guideline range that are talked about but not one where there are facts like this.

What we have here is a defendant who, you know, engaged in conduct that was both lying about something that's material, but we also have somebody who like affirmatively went across the border and was withdrawing money from a foreign bank account. We haven't heard anything about that.

I appreciate that there are many courts that will end up varying, you know, in these type of cases. I would imagine in those cases I'm also -- you know, would be making arguments that there needs to be meaningful sentences and perhaps there are reasons for departure, like cooperation or something else that are not here, but I haven't seen anything that is -- you know, that would show that a sentence with either imprisonment or some type of confinement would result in an unwarranted disparity.

Then, Your Honor, one thing I wanted to talk about, and this something that doesn't arise in most of the sentencings that I have before the Court, so frankly, I had to bone up on this before I came here, is because the guideline

ranges are frequently much higher. But in Zone C, if the Court stays and does not vary, as I understand it, there are two options: Imprisonment or imprisonment with half or more of the imprisonment to be in the prison itself with the rest in community confinement or home detention.

You know, if the Court varies, the government does not think the variance should be below Zone B, you know, and certainly shouldn't be Zone A and full probation. There are options in Zone B that we think, you know, would involve the type of confinement that would be meaningful in this case.

As the Court is no doubt familiar with, that's just a straight sentence of imprisonment, imprisonment with at least one month in prison with the rest to be community confinement or home detention, or probation, which I'm concerned about, but least in a Zone B situation, the Court would be dealing -- then imposing a condition that involved intermittent confinement, community confinement or home detention.

But ultimately, I wanted to address that there are an array of options available to the Court. The option that we don't support is an option of straight probation because of the concerns about the message.

THE COURT: Okay. Talk -- I don't want to cut you off. Go ahead.

MR. MURRAY: I have one final point to make, but with whatever the --

THE COURT: No. Go ahead. Make your point, and then I have a question.

MR. MURRAY: The last -- it really goes to the ultimate point that I mentioned, is this meaningful.

Our point is that we don't think probation would be sufficient. Without prison, the question is, what would be the punishment that the defendant would be receiving here.

We appreciate that after a long, hard life of work, he's retired. But he's not going to his lose his job if he gets probation. He's not going to lose a professional license. He has the money to pay the restitution here and pay any fine without any problem. You know, he's certainly experienced shame, but frankly, it's not clear to me that that's enough here, and I submit to you.

You know, there are numerous defendants that appear for sentencing that don't have his resources. They can't hire somebody as excellent as Mr. Bachner. They can't hire a consultant to analyze all the sentences throughout the Eastern District of Pennsylvania. They don't have the resources and advantages to have the numerous letters that have been submitted. And those people are sentenced and usually sentenced to prison and after that they don't have the ability to -- have the resources. And frankly, the government submits that, you know, Mr. Cooley shouldn't be treated in such a different way and that there needs to be a meaningful sentence

here.  And as a result, I think, you know, confinement of at least some degree, you know, certainly prison would be appropriate, is warranted here.

THE COURT:  Okay.  So I have two questions for you.

MR. MURRAY:  Yes.

THE COURT:  One is, I think one of the things that runs through the sentencing memorandum and certainly the letters that accompany it is the notion that if I imprison Mr. Cooley, it carries with it some number of collateral consequences, right, particularly addressed as to his mother, I think, and then to some extent to his niece and her son.

I guess my question is, how, if at all, does the government think that should factor into the sentencing analysis?

MR. MURRAY:  Yes.  Your Honor, and I don't want to discount those at all.  I certainly with respect to the defendant's niece -- niece or nephew?  Oh.

THE COURT:  Niece and then a great-nephew, I guess.

MR. MURRAY:  Her son.  A great-nephew.  I recall -- I recall the picture, which, you know, obviously I think we'll all recall.  And I recognize that.  And that is meaningful.  I think that -- what I submit to the Court is that the defendant has created this very strong network of people around him.  And I think that's wonderful, and that's certainly to his benefit here.  But the defendant as a result is not the only person who

can step up here. He has stepped up throughout his life clearly, and he has -- physically and emotionally, but also with financial resources, but there are other people available.

I mean, what this is different is a sentencing I had where there was a defendant and his wife and his wife -- they didn't have any other family members that were, you know, available or somebody who had like three young kids and a job and she couldn't support, the wife, and the wife was bedbound and there was nobody else to do it. There just wasn't an option. That's not the situation we have here. So although it can be taken into account, I don't think it should be determinative because there is a significant support network in this situation.

And Your Honor mentioned --

THE COURT: My other question is -- again, I'm not sure where I'm going to be. I haven't even heard from Mr. Bachner yet or Mr. Cooley, but I wind up doing -- if I wind up with some sort of a term of imprisonment as part of the sentence, what's the government's position on self-reporting?

MR. MURRAY: The government doesn't object to it. Mr. Cooley has stood by his obligations with respect to the Court.

Perhaps, if I may as you're asking that, Your Honor, and maybe it's been clear. You mentioned a potential fine issue. I don't have a lot on -- to say on the range with respect to it. My concern is ultimately any fine within the

range in light of Mr. Cooley's fortunate financial situation would not be sufficiently meaningful to undermine the need for some type of confinement.

THE COURT: Okay. Understood. Thank you.

All right, Mr. Bachner.

MR. BACHNER: Thank you. Your Honor, initially I'd like to introduce some members of the family so the Court is aware of who's here in the court.

THE COURT: Okay, great.

MR. BACHNER: Racha is Mr. Cooley's partner for the last ten years or so. And Madelyn is his daughter, and Max is his son. And I thought it would be important for Your Honor to somewhat meet the family.

THE COURT: Good afternoon to all of you. Thank you for being here. I appreciate it.

MR. BACHNER: Your Honor, I've been doing criminal defense work for, I hate to admit it, for about 31 years now, and I was prosecutor for 4 years before that. This job is hard on both sides. Mr. Murray is a formidable lawyer. He fights vigorously for his position, and we respect that.

We also respectfully and vigorously disagree with the position he's taking here today, and I'll go through the reasons why.

As Your Honor may or may not know at this point, the government always objects to probation, so we're not surprised

by Mr. Murray's vigorous objection here. In some of the cases I cited for the Court, the government objected in those tax cases, in all, quite vigorously, and the Third Circuit has shot them down in tax cases that were substantially more egregious than the one before Your Honor in which probation was afforded to those defendants. And I will go through that with Your Honor.

And the reason we gave the Court this consulting, that information, is because it's one thing for me as an advocate to argue to the Court. It's another thing for me to give Your Honor a statistical analysis of what's out there so Your Honor has a more objective and fairer understanding of what the courts are doing to help you in the disparity-related issues.

And I thought that it was just the smartest thing to do to help Your Honor understand what's out there. And that was the reason that we did that.

So, Judge, after all the time I've been doing this, I can tell you the one job I never want to have is the one that you have, because imposing and making a decision as to what is a fair and just sentence on another human being is, is a very, very difficult thing to do, and it's a job that I don't know if I have it in me to do, quite frankly. But we understand, Your Honor, people who are going to come before you for sentence, some of them are very, very bad people, demonstrated by their histories and by their conduct over the course of a

lifetime who do very bad things. And some people come before Your Honor and will come before Your Honor in the future are people who have committed crimes or a crime and are essentially very good people. And in many ways the conduct they've committed, if Mr. Cooley was a really bad guy in this case, the effect on the government is the same. It's an $89,600 tax problem.

And we have in front of you a gentleman who is historically a very, very good -- and frankly, Your Honor, when I got these letters, they seemed just remarkable to me as the kind of human being Mr. Cooley is.

He is a fundamentally good man, and I'll get to some of the questions that Mr. Murray raised regarding the criminal conduct. And I will address those.

So why, Judge, and how you should be treating a 67-year-old man who other than this conviction had a DWI in 1999? And the Court has laid out or the statute has laid out a bunch of criteria for the Court to look at, again, to give you some guidance as to what is the appropriate sentence.

And that first characteristic or that first criteria is the nature and circumstances of the defendant and the history and the characteristics of the defendant. And to me, Your Honor, I don't think it's any accident that that is the only criteria that is in the conjunctive. I put this in our memo. I think Congress was telling the Court that you can't

look at the nature and circumstances of the offense alone.  You have to look at it and, in the conjunctive, with the history and characteristics of the defendant, because they want the Court to make sure that that individualized assessment of that human being before the Court, what's a fair and appropriate sentence given all of those factors.

And Judge, I'm going to take a second just to read you something I know you've read, and I don't mean to belabor it.

But Judge Rakoff, my home court back in New York, Your Honor may have met him, he's a highly respected and really, really decent judge.  And he just put this in words that I could never imitate, so I'm going to read them.

And Judge Rakoff said:  Surely if ever a man is to receive credit for the good he has done and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing when his very future hangs in the balance.  This elementary principle of weighing the good and the bad, which is basic to all the great religions, moral philosophies and systems of justice was plainly part of what Congress had in mind when it directed courts to consider as a necessary sentencing factor the history and characteristics of the defendant.

That is an eloquent way of saying to a Court, the guy in front of you, Judge, in the scales of justice, where does he weigh, what does that individual -- individualized assessment.

Before I get into some of the facts initially, this parsimony clause of 3553(a), which we've addressed in our memo, is the overarching -- in US v. Gall I believe they called it the overarching principle of sentencing. And that is that a Court is obligated to impose a sentence which is, quote, sufficient but not greater than necessary to meet the goals of sentencing.

And sufficient but not greater, Your Honor, I argue means what is the lowest sentence possible that the Court could impose sufficient but not greater to meet the goals of sentencing. And we respectfully urge in this specific case regarding this man over here, that probation, Your Honor, is the appropriate sentence with a term of community service so that he can give back and continue to give back to the community.

And we would agree, Your Honor that an upward departure in the fine would not be inappropriate. I hate to speak in double negatives, but I don't think it would be inappropriate.

So Judge, what are some of the facts of the case?

Mr. Cooley, Your Honor, back in October of 2013, about six years ago, made a false statement on his tax return. Mr. Murray is absolutely correct. He withdrew money in cash from an ATM machine over the border in Canada not far from Michigan. And Mr. Murray says, well, there's no explanation as

to why.

The answer, Your Honor, is because Mr. Cooley screwed up. Mr. Cooley made a greedy, improper decision, and he's here to pay for it. That's what he did. And unfortunately, Your Honor, people of means do stupid things, just like people without means do stupid things. And candidly, Your Honor, I know there's a need to treat -- to be careful that the wealthy are not necessarily treated different than anyone else. We're in a fair world, and the finger should not be on the scale. But even a poor person, Your Honor, who has a guideline range of 13 and 12 to 18 months in jail for committing the same offense, had access to an ATM and took out all that money, and also was charitable and also had physical conditions, it would be appropriate to give that person probation as well.

Mr. Cooley certainly shouldn't be punished because he's wealthy. He should be treated the same. If I were here representing an impoverished individual, and I have done that in my career, I would be making the same arguments to you, Judge, identically with the same zealousness and vigorousness because I think it would be appropriate for that person as well.

So Judge, the bad decisions that Mr. Cooley has made in his life, that one bad decision he has made, has seriously impacted him. And while this investigation has been ongoing for several years, he has been in a virtual confinement of his

own. Having been doing this for a while, Judge, I don't think people seriously understand or some people don't appreciate what it's like to be under investigation by the US Government. They do their job. And thank God they do; otherwise, we'd have anarchy. But at the end of the day, Your Honor, you're looking around every bush. You're never completely happy. Clients describe to me how it's like being told you have a disease and you try to forget about it, but it's always in the back of your mind.

And that's what it's been like for Mr. Cooley. And it has actually impacted his health. He has had all the health issues we've laid out in the memo. It has affected the health of Racha, who has been an emotional -- literally an emotional and depressed wreck over this. So this is not -- this has not been a party.

And we'll get to the deterrence issue later, but nobody should feel if Mr. Cooley gets probation, wowie, I'll steal $89,000 and not declare it and I'm just going to get probation and have to live for three years under investigation by the US Government and hire a lawyer and spend a bunch of money and be embarrassed in my community and lose all of the dealings with my children and telling them I'm in trouble.

In US v. Gall, the Supreme Court was very clear. Probation is not a slap wrist. I've had clients who have said, boy, I'd rather have gotten a year than be on probation. Your

travel is limited, where you go. People want to know what you're doing and where you're going. It is a restrictive situation to be on probation. These officers do their job, and they do it seriously.

So in Gall the Court was very, very clear. And I've cited that portion in my memo. We shouldn't consider probation to be some insignificant matter. Is it better than going to jail? Of course. Does Mr. Cooley want to go to jail? No human being wants to go to jail who is sane. But it is not -- Your Honor should not feel -- and I know you don't -- that a probationary sentence is somehow some slap on the wrist. It's a significant type of punishment and restriction on liberty.

So Judge, who is Jeffrey Cooley? Briefly, born in 1953 in Monroe, Michigan, to two hard-working people. Dad was a pipefitter. Mom was a homemaker. Dad died seven years ago at the age of 85 of a heart attack. Mom is still with us. She's a breast cancer survivor. And she relies very heavily on Jeffrey for help. Emilia, Jeffrey's sister, is someone who works with special ed children. Jeffrey's brother Lawrence, as we put in the memo, died a little bit ago.

I just want Your Honor to note I digress.

The decision -- I'm very reluctant when I do sentencing memos to come off with the appearance that I'm trying to play on heartstrings because I think that that's a dangerous road to go. The decision to put a picture of Lawson

in there was mine because I think it was important for the Court -- the picture speaks 1,000 words -- to visualize just who this young boy is that Mr. Cooley helps care for. And if there's any blowback on that, and I don't think there is, that's my fault. That's my decision. I thought it was important for the Court to see it.

So Your Honor, as I said, Lawrence, Mr. Cooley's brother, died 30 years ago at the age of 33.

Jeffrey's parents were dedicated. They taught him right from wrong. And he's lived most of his life, the overwhelming majority of his life, trying to live up to those credentials and trying to live right from wrong.

When he got out, he taught public school for three years. Then he went to La-Z-Boy as a marketer. And then he took -- he joined Calphalon, a fairly significant pot company. I don't mean cannabis; I mean pots and pans company. And in 1990, Your Honor, until 1998 he brought that company from $12 million to $128 million, then creating jobs for hard-working people where they paid bunches of taxes, ironically, you know. So here he is doing this silly crime, the stupid thing that he's done, and at the same day he's for his lifetime creating taxes and making sure people earn, et cetera.

He then, Your Honor, goes to Newell Rubbermaid where he grows that company into a $1.2 billion company.

He retires in 2004.  And up until that point in time, Your Honor, Mr. Cooley has shown himself to be a man of stability, dedication, loyalty and honesty, all doing the right things the way he was taught by mom and dad to do.

Indeed, Your Honor, him being here in front you on this day is the antithesis of what he is and how he was brought up to be.  And I've gotten to know Jeffrey pretty well over the last three-and-a-half, four years.  He is -- not just that he's embarrassed for what he's doing and humiliated for being here, he knows what he has done is wrong.  He is incredibly and truly remorseful for his conduct, and to his credit, he has never once -- actually differently.  Max was here, his son Max was here when he pleaded guilty so that he would see what was occurring.  That is the deterrence that he was sending out generally to the public, that he brought his son here.  And if you're thinking of doing that type of conduct, you'll bring your kid here too and you'll go through the same stuff I'm going through.

And he brought his kid here.  And his kid saw it, loves daddy.  It's his role model and he loves him, but he realizes that even good people like dad make mistakes and I'm not going to make -- I shouldn't use the word "mistake."  Do wrong things, and I'm not going to do that kind of a wrong thing either.

He's told his friends what he's done.  He's exhibited

remorse to them. He's never justified his conduct. He never said I'm the subject of some like -- people are after me, the government is crazy. He has owned up to what he's done. He has pleaded guilty, and he's tried to do the right thing and fix what he did.

Judge, Racha, who is also here, is one of the innocent victims that are always attendant to these type of crimes. Racha, Your Honor, we've put in the letter the nature of her problems that she's gone through, what her brother's problems were and how Jeffrey helped him deal with his issues, his rehabilitation-related issues. That's the kind of guy Jeffrey is. He sees a problem, he tries to help people fix them.

So Your Honor, regarding his medical issues, one of the factors in 3553 is to impose a sentence that takes into consideration the most effective means of treatment. We weren't in our memorandum attempting to demean the BOP which tries to do as good a job as it can do catering to so many people who are in jail.

The point we're making, Your Honor, is that someone with Mr. Cooley's medical issues, given the level of his guideline range, which we do not demean or find de minimus, we think it's serious, 12 to 18 months, that the risks attendant to putting Mr. Cooley in a prison environment, are they worth, given the nature of the sentence he's looking at, the risks involved. And the studies we put in on the BOP, they're not

anecdotal. There was a study done about the BOP's efforts to do the right thing. But if Mr. Cooley is in the courtyard of a jail and has a heart attack, they're not getting him to a hospital very quickly. That's just not happening. If Mr. Cooley has some other physical issue, he's not going -- not because they don't want to or they don't care, they can't.

And if you put him in a prison hospital, if he goes -- they will put him in either North Carolina or in Boston, where these are high-end jails, the people that Mr. Cooley is housed with are going to be violent defenders and individuals with more serious criminal history. They're at least a medium level jail. They're not camps, and they're not low level. So the stress level in these jails are significantly higher for very obvious reasons. And there's a decision by the BOP that they just haven't put hospitals in the lower level -- lower level environments.

Your Honor, the main focus or a main focus of our memo has been what we considered to be the extremely charitable nature of what -- of Mr. Cooley. And we have cited a whole bunch of cases for you. And when Mr. Murray indicated, you know, that Mr. Cooley is, you know, some rich guy and therefore, you know, he should be perhaps punished differently, in the Tomko case, Your Honor, Mr. Tomko was an extremely wealthy man who engaged in conduct in order to fix his home. He had 12 subcontractors and one general contractor fill out

phony reports, phony filings, phony invoices, so that he could justify this. And there was a tax loss of almost $230,000 in that case. Because the guideline ranges had been modified, his range was the same as Mr. Cooley. And the Court, citing his charitable conduct, the Third Circuit upheld a variance from 18 -- from level 13 to probation.

In Serafini, the Court also held up a very, very significant, very, very significant departure.

In the Robinson case, the Third Circuit upheld a variance from 18 to 24 months for two brothers who had not filed taxes in three years and had used check cashers to hide $1.5 million in income. The Third Circuit upheld a variance to probation saying that the government's characterization as that of being too substantial a variation is misleading and saying that no, this was, in the Court's words, an insubstantial variance.

So I would argue respectfully that the Third Circuit understands -- and that was based also on the defendant's charitable -- extremely charitable situations in all those cases. And there's many others I've cited for the Court.

So I think it's important for Your Honor to know that the charitable issues we've cited in cases of substantially more egregious justice than the ones in front of Your Honor, sentences of probation have been afforded, upheld by the Third Circuit as wholly reasonable.

Judge, it's also important to know that the charitable conduct that Mr. Cooley engaged in, whether that's setting up homes for people with dementia, we've given to letters to the Court about his help with children. I mean, there's just a whole variety of letters dealing with the stuff that he's done for people that have gone back decades. This is not a situation in which a person says, oh, geez, I'm getting sentenced, I better get involved in some charities. This is who the man is. Mr. Cooley is a charitable, loving, caring, loyal, giving guy.

The colleagues and people who wrote to Your Honor who he has trained, what they've learned greatest from him is not how to make money, even though he's helped them do that, it's noticing how he has given his time and his efforts and the success he's made in helping people. And the level of his charitable contributions, Your Honor, is extraordinary.

And as the old saying, charity begins at home. Well, Mr. Cooley's charity certainly did do that when Ashley, his niece, when Lawrence died, his brother, he took Ashley in, essentially becoming a surrogate dad, took care of her, paid for her, put her through school, became someone who mentored her and taught her. When Lawson developed cancer, her son, Jeffrey was there routinely, continues to be there routinely for them.

When Ashley's husband had to give up his job because

Lawson needed a parent present 24/7 because he freaked out if a parent wasn't literally in the room with him when he woke up, his dad had to quit the job, Jeffrey paid for all of that so he could afford to leave the job. Jeffrey brings his mother there to visit Lawson.

And this is, you know, the type of person that he is. And there are a lot of people out there with families who go through hard times, and there's nobody who cares for them like that.

This is not like we can expect from anybody. Jeffrey is truly a unique and remarkable individual when it comes to the nature of the work that he gives.

And I don't want to belabor it, but Dr. Kessler, a noted plastic surgeon in the Ohio area, talks about in Exhibit J how Jeffrey convinced him to give free medical services to the uninsured children of Toledo, which he has done.

David Reed, Your Honor, in Exhibit K talks about how Jeffrey started a charity to help the poor called A Taste of the Nation charity, raising hundreds of thousands of dollars to feed the hungry in the Toledo area.

Todd Berman, another friend of his, at Exhibit M talks about how he helped him personally when he had Parkinson's, when a family member had Parkinson's, and Jeffrey has also been so active in all of the community-related charities.

Jeffrey opened up a scholarship in the name of his

son -- in the name of his brother, rather, to help the needy in the area.

This, Judge, Your Honor, we understand that acts of kindness don't remove the crime that Mr. Cooley committed. But -- nothing is going to remove that. It will stay with him forever. The issue, Judge, is what is the just punishment for a man who has done all of these good things in his life. And we ask that the Court be creative in devising a sentence that spares Mr. Cooley the need to go to jail.

Judge, I attended -- just a few more minutes, Your Honor. I attended a symposium for the American College of Trial Lawyers back two years ago, and they had a fellow who actually was on 60 Minutes recently who committed a bank robbery when he was a young man and eventually ended up clerking for a federal judge. He has become a sentencing go-to guy about what the jails are like in the United States and how we imprison here.

And at that symposium he spoke about the fact, these are his statistics, that although the United States has 5 percent of the world's population, we have 25 percent of the worldwide population of prison. 5 percent of the word's population but 25 percent of the world by population is in jail. 2.3 million Americans are in prison and 113 million Americans have family or friends who are in prison. And the result of that study was we sentence in the United States too

many people to jail that other countries don't and our system is no better.

And at the end of the day, Your Honor, there is now a movement in the federal courts and in our administration, bipartisan, to alleviate the overcrowding and the unnecessary warehousing of human beings in jail who don't really have to be there. They're no really better off. It costs eight times more to imprison someone than it does to put them on probation.

And the question becomes, Your Honor, in this bipartisan movement, is it necessary to put a 67-year-old man who has serious health issues, who has demonstrated a lifelong career of stability and charity and love for his community, do we need to warehouse Jeffrey Cooley, or should we, like the cases say, put him on probation and use those talents in community service to continue to help. To continue to help.

And I submit, Your Honor, that that's the situation. Specifically deterring Mr. Cooley is -- statistically it's 3.5 percent of people like Mr. Cooley commit a crime. Mr. Cooley, I submit to Your Honor, there's a 0 percentage that he's going to do that. This offense occurred six years ago. Mr. Cooley has not been arrested since.

As far as general deterrence, I've addressed that. No person out there watching this is going to say, I'm going to commit this crime because he got probation. He didn't have to go through anything. Mr. Cooley has gone through much torment,

physical and otherwise. And again, as the Courts have said, probation, Your Honor, is a significant deterrent.

So finally, Your Honor, the MCM Data Consulting matter that we gave you shows that out of the six people in the Third Circuit charged with conduct identical to Mr. Cooley, the same guideline range, five out of six of those individuals got probation. The one who didn't got a one month jail sentence.

Our request, Your Honor, although we understand that whenever a defense lawyer asks for probation, our hearts are always in our mouths, Your Honor. I didn't sleep very much last night to be very honest with you.

The request we're making, Your Honor, is within the heartland of how federal judges are sentencing defendants with this guideline range for similar types of offenses. Probation, Your Honor, is something that judges realize is appropriate to avoid the warehousing of individuals for these types of offenses. And I would respectfully urge that Your Honor follow the trend that is occurring here in federal courts all over the country, where individuals with Mr. Cooley's personal characteristics are receiving sentences that can take advantage of the abilities they can to help the community and help society without punishing them in a way which I respectfully urge this Court in this case is just simply unnecessary to me to impose in sentencing, and certainly under the parsimony clause it's more than sufficient and it's more than greater

than necessary to meet the goals of sentencing.

And we urge Your Honor to temper what can at times be some cold mercy with some warm justice, Your Honor, and to give Mr. Cooley a sentence of probation that he'll live with for the next few years and some upward fine, Your Honor, on him. And Mr. Cooley, Your Honor, will never be before you again, or any other judge. Thank you.

THE COURT: Thank you, Mr. Bachner.

So Mr. Cooley, certainly I read the letter that you submitted as well as all the others, but you have an opportunity now to address me. And I assume you've discussed this with Mr. Bachner. It's your decision, but I'd certainly encourage you if you have anything to say to step up to the podium and address me.

THE DEFENDANT: Your Honor, do you mind if I get a glass of water first?

THE COURT: No, of course not.

THE DEFENDANT: Thank you, Your Honor.

At my age, I never imagined I'd be standing before you or any judge facing punishment for committing a crime. I was brought up by a wonderful, hard-working family. I've always tried to live my life according to the principles they taught me. I have tried to be a good person, a good partner, a good father, a good neighbor. I've always believed that being blessed with financial success meant that I should share it

with others.  This obligation is one I've always gladly accepted, but I'm here today because I committed a crime and failed to live up to the principles I was taught and believe in.  I acted selfishly and not charitably.  I do not think I can verbalize the regret that I feel for my conduct.

Over the last several years my regret for my crime has clung to me daily, in everything I do.  Awaiting this day of sentence for what I inexcusably did has been emotionally and physically debilitating to me, and more importantly, to those I love.  I will carry that regret for the rest of my life.  I'm ashamed of my actions, and I'm ashamed of the humiliation I brought to those around me.

This regretful event has been an embarrassment to everyone I love, from family and friends to each of the colleagues in different organizations I'm involved in within the community.  I am deeply sorry.

I'd like to take this opportunity to apologize directly to my family.  I am greatly -- I'm grateful for the support of Racha, my partner; my mother, who is not here today; my children, Maddie and Max; and my friends who have stood beside me despite the selfish crime I committed.  As any parent knows, nothing hurts more than when your kids are hurting. I've never tried to shy away from acknowledging my family in what I did.  I sincerely regret the shame and the stress I've brought upon them because they've done nothing wrong to deserve

this.

Today it is important to me that I express my sincere apologies to the US Government for my actions. I have learned immensely from my behavior and will never again act this way.

Your Honor, I know I can't undo my wrongs, but instead I can choose a respectable, honorable path forward. I hope I'll have a chance to turn this around and correct for my wrong day of having a positive impact on the community and people around me. I will use the experience as my continued motivation to do good for other people.

Thank you for the opportunity to speak to you today.

THE COURT: Thank you, Mr. Cooley. I appreciate it.

Mr. Bachner, anything else?

MR. BACHNER: No, Your Honor. Thank you.

THE COURT: Okay. I want to take five minutes just to mull this over before I announce a sentence. So let's take a five-minute recess and then I'll be back. Okay?

(Recess at 1:34 p.m. until 1:44 p.m.)

THE COURT: Be seated, everybody, thank you.

So as we've heard here today at sentencing, what I have to do is consider a variety of factors that are set forth in 18 U.S.C. Section 3553(a). And that includes the sentencing guidelines and a variety of other factors. I just want to kind of walk through those, give you my thoughts and tell you where I am.

So the first of them is the nature and circumstances of the offense and the history and characteristics of the defendant. So I'll take those sort of in order.

This was a sophisticated scheme. It was not a crime of necessity, as we've heard. And we heard as a concession, it was a crime of greed. You know, Mr. Cooley had generational wealth when he committed this crime that already could ensure his children and grandchildren had some means. And the lengths to which he went to avoid detection and to avoid paying taxes for what was for him a relatively small amount of money just demonstrates avarice and nothing more.

But that said, and the letters make this point and Mr. Bachner made this point, and Mr. Cooley, you made this point as well to me, and I hear it. You yourself certainly have done a lot, have an enormous number of redeeming qualities. Service to your family, including your extended family, is worthy of note and accommodation. You've done remarkable works in the community, and you, as a result, have high standing and high regard. You're held in high regard by others in the community. I can tell you truthfully that I was touched by some of what the letters had to say about you and about the way you supported your family and your friends and employees through both personal and professional tribulations in their lives.

And you know, I agree with Judge Rakoff that this is a

time to take account of all of those things. You know, and I do note that that community standing is going to be damaged as a result of all of this. But the work that you've done building that standing is worth something as you stand before me and stand before the court.

The second factor that I have to consider is the seriousness of the offense, to promote respect for the law and provide just punishment for the offense, that this is a serious crime. Tax laws are in place for a reason. You know, Congress has made a policy choice to have a progressive tax code that places additional burdens on the wealthiest of us in order to support those with less. The conduct at issue here did not just deprive the government of some revenue. At some level it demonstrated an effort to avoid Congress's progressive taxation and to take from other citizens who do have less.

It's an economic crime, and so I reference the idea of an increased fine. Mr. Bachner, you acknowledge that. I think that part of the punishment does have to be economic as a result.

Deterrence, I think we're all in agreement here that there's not really any meaningful risk that Mr. Cooley is -- that you're going to commit any other crimes. I do believe that. You're not going to. It's not a concern I have. So I don't think there's an issue with specific deterrence here.

General deterrence is an issue. You know, I

understand the argument that Mr. Bachner made about the severity of the sentence not being a significant deterrent factor, but frankly, the severity of the sentence is all I can control. I can't control the risks of detection. And at some level, someone in Mr. Cooley's shoes is making a risk calculus that the risk of detection coupled with the severity of the sentence is small enough that it justifies the potential gain that he stood to get from this effort. And I noted as well as the government did the preliminary comments to 2T1 of the guidelines talking about the need for deterrence, particularly in these types of cases. And so I do think it's important that a sentence be structured to try to prevent future tax-related crimes.

There's a factor about protecting the public from future crimes of the defendant. That is absolutely not an issue here.

Provide the defendant with needed educational or vocational training, medical care or other correctional treatment. It's not really an issue here. I understand Mr. Bachner's point that, if anything, the defendant's need for medical care argues against a significant prison term. Certainly there's no doubt. I think the government has conceded he'll get certainly better treatment out of prison. I'm not persuaded and I'm not prepared to make a finding that the Bureau of Prisons' care is just below a level that makes it

48

inadequate. I'm aware of what the Inspector General has said about the Bureau of Prisons.

There is, you know, a question about the kinds of -- taking into account the kinds of sentences available. I've thought about that a great deal. I've certainly heard argument about a range of possibilities, community confinement, home confinement, fines, probation. Those are all things that are possible, particularly given sort of where we are on the sentencing tables.

Policy statements, we've talked about some of them. You know, there's another one that I'll reference in a moment with respect to the amount of the fine. And so I have considered the various policy statements both as to the need to deter in tax cases and what the level of fine should be. I think those are the relevant policy statements that I found here.

The disparities issue, I don't see it as a strong issue here. I do understand the sort of the range of cases that you've pointed me to, Mr. Bachner. Those aren't this case. You know, I'm not going to -- I haven't waded into trial of those cases. Certainly I'm aware in general of where they wind up. I read the case law on it. Certainly I've seen, for example, in the Third Circuit's decisions some references to the fact that some of the judges on the Third Circuit, had they been sentencing judges, would have come out differently. And

so I think those ranges certainly acknowledge that I have a broad range of discretion, and I do. You know, it's all in place.

The last thing is restitution. And the government references this in its sentencing memorandum. Mr. Cooley, I know you've already paid the restitution into the court's registry. I think as a technical matter, you'll hear me order it. That's really just so that I can then authorize the Clerk of Court to pay it to the IRS. And those are the joys of working for government.

So that's where we are. I do think a variance is appropriate here. What I'm going to do is I'm going to vary the offense level two levels down, to an offense level of 11, which puts me in Zone B and results in a recommend sentence of 8 to 14 months.

My intention -- and I'll -- it will be in the sentence in a moment, but Mr. Cooley is -- I do think some small amount of prison time is important here. I think, to the government's point, paying a fine is -- it's a punishment here but probably not enough. And from a general deterrence standpoint, I think just hearing the fact that you can go to prison is significant. But I don't think a significant prison sentence is appropriate here.

And so what I'm going to plan to do and what the guidelines give me the discretion to do with that 8 to 14

months guidelines range is I'm going to order a one month prison sentence followed by supervised release, and the first seven months of supervised release will include home detention.

I also think an upward departure is appropriate here for the fine. As I said, -- there are some commentary to the guidelines, in particular it's application note 4 to Section 5E1.2 of the guidelines, which says that the guidelines envision that where the amount of loss caused by the offense exceeds the maximum of the fine guideline, an upward departure from the fine guideline may be warranted.

And so here the fine guideline would only be $30,000. The application note talks about an expectation that it will -- the fine guidelines -- or the maximum fines will be at least two times the amount of the loss. And so here that would be -- here the maximum fine is only about one third of the total loss, so I think an upward departure is in order.

So with all that, let me pronounce the sentence.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Jeffrey Cooley, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of one month. Upon release from imprisonment, the defendant shall be placed on supervised release for a term of 18 months.

Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the

probation office in the district to which the defendant is released.

While on supervised release, the defendant shall not commit another federal, state or local crime; shall be prohibited from possessing a firearm or other dangerous device; shall not possess an illegal controlled substance; and shall comply with the other standard conditions that this court has adopted.

The defendant must submit to one drug test within 15 days of commencement of supervised release and at least two tests thereafter as determined by the probation officer.

In addition, the defendant shall comply with the following special conditions.

The defendant is to be confined to his residence for a period of seven months commencing at the direction of the US Probation Office. The defendant shall be required to be at this residence at all times except for approved absences for gainful employment, community service, religious services, medical care, educational or training programs and at other such times as may be specifically authorized by the US Probation Office.

The defendant shall wear an electronic monitoring device and follow electronic monitoring procedures. The defendant shall permit the probation officer access to the residence at all times and maintain a telephone at the

residence without any custom services or portable cordless equipment.

The defendant shall comply with any other specific conditions of home confinement as the probation officer requires.

The defendant shall pay the costs of the electronic monitoring.

The defendant is to fully cooperate with the Internal Revenue Service by filing all delinquent or amended returns and by timely filing all future returns that come due during the period of supervised release. The defendant is to properly report all correct taxable income and claim only allowable expenses on those returns. The defendant is to furnish the Internal Revenue Service with information pertaining to all assets and liabilities, and the defendant is to cooperate fully by paying all taxes, interests and penalties due, and otherwise comply with the tax laws of the United States.

The defendant shall provide the United States Probation Office with full disclosure of his financial records to include yearly income tax returns on the request of the probation office. The defendant shall cooperate with the probation officer in the investigation of his financial dealings and shall provide truthful monthly statements of his income.

The defendant is prohibited from incurring any new

credit charges or opening additional lines of credit without the approval of the probation officer unless the defendant is in compliance with any payment schedules for fines and restitution obligations.

The defendant shall not encumber or liquidate interest in any assets unless it is in direct service of the fine or restitution obligations or otherwise has the express approval of the Court.

It is further ordered that the defendant shall pay to the United States a fine of $210,000. The Court will waive the interest requirement in this case. The fine is due immediately and shall be paid in full within 30 days of sentencing.

The defendant shall notify the United States Attorney for this district within 30 days of any change of mailing address or residence that occurs while any portion of the fine remains unpaid.

It's further ordered that the defendant shall pay to the United States a total special assessment of $100 which shall be due immediately.

It's further ordered that the defendant shall pay restitution to the Internal Revenue Service in the amount of $89,600. As I noted, Mr. Cooley's already paid that money to the registry of the court, and the Clerk of the Court is authorized to transfer that money to the Internal Revenue Service.

So that's the judgment of the Court.

Mr. Cooley, the government has not objected to the notion that you can self-report, and I find that that's appropriate in this case. So it is ordered that the execution of the prison sentence is suspended until Monday, March 2, 2020, at which time the defendant is directed to report to an institution designated by the US Marshals and Bureau of Prisons no later than 2:00 p.m. to commence service of said sentence.

In the interim time, Mr. Cooley, you'll remain on bail, out on the same terms as you have been, in touch with the pretrial services on the same basis as you have been.

Okay. So that's all I have in terms of sentence.

Mr. Bachner, can you deliver the appellate rights to Mr. Cooley, please.

MR. MURRAY: Your Honor, I would ask that they be loud enough that they be on the record.

THE COURT: I'm sorry, I thought you were giving him some advice, but can you give him the appellate rights on the record, please.

MR. BACHNER: Mr. Cooley, you have a right to appeal the sentence. If you do appeal, I'll file a notice of appeal for you within 10 days, I believe --

THE COURT: 14.

MR. BACHNER: -- 14 days after the imposition of sentence. If you can't afford a lawyer, they'll appoint a

lawyer. If you can't afford a lawyer and decide to appeal, we'll appeal subsequent to that time.

THE DEFENDANT: Okay.

MR. MURRAY: Thank you.

THE COURT: Okay. So let me -- I'll ask counsel for the government first -- did you have something, Ms. Santella?

PROBATION OFFICER: Could you clarify the term of supervised release that you imposed?

THE COURT: It was 18 months with the first seven months being home confinement.

PROBATION OFFICER: I believe that the stat max for supervised release is one year.

THE COURT: Oh, is one year? I apologize. Thank you.

Then it will be -- the supervised release period will be one year with the first seven months being home confinement.

Thank you for catching that.

From the government, anything else I need to cover?

MR. MURRAY: No, Your Honor.

THE COURT: Okay. From the defense perspective?

MR. BACHNER: I just have a housekeeping matter.

THE COURT: Yes.

MR. BACHNER: My mother told me, Your Honor, if you don't ask, you don't get, so I'm going to.

I know that you've imposed sentence. I would ask if the Court could consider converting that to an eight-month

sentence of home confinement and avoid the 30 days of surrender date. I'd ask if your Your Honor would consider instead of seven months of home confinement, making it eight months of home confinement or even nine months of home confinement to avoid what we're concerned about.

THE COURT: Meaning to avoid a custodial term with the Bureau of Prisons?

MR. BACHNER: Correct.

THE COURT: Yeah, I have considered that. I don't think it's appropriate here. I do think it's important that there be some period of time that's custodial with the Bureau of Prisons. I understand why you don't want me to do it, but that's where we are.

MR. BACHNER: All right, Judge.

THE COURT: Okay.

MR. BACHNER: Your Honor, we have just one administrative matter.

THE COURT: Yes?

MR. BACHNER: If Your Honor could recommend -- BOP will do whatever they want, but if Your Honor could recommend that he be housed in a location close to his home in Florida to facilitate visits, et cetera, not unusual -- the Court's recommendation is only a recommendation, BOP can do whatever they want, but if you could recommend that.

THE COURT: Yeah. I have no problem with that. I'm

certainly willing to put that recommendation on the record.

MR. BACHNER: Thanks.

THE COURT: I thought the First Step Act actually imposed some requirements to that effect now, but --

MR. BACHNER: They might, but if I'm wrong, I apologize.

THE COURT: If we're gilding the lily, we're gilding the lily, but I'll certainly put the recommendation on the record.

MR. BACHNER: Thank you.

THE COURT: Anything else?

MR. BACHNER: No, Judge.

THE COURT: Let me just say as we wrap up, Mr. Cooley, I know it's not exactly the outcome you wanted, but I do want to wish you the best of luck. I really do mean what I said, I do take note of all the good works you've done, and they're a credit to you. I think you can get through the 30 days and come out and sort of resume where you are.

I also just want to say to your family, I really do appreciate your being here. My time in private practice, I did a little bit of work for some criminal defendants, but more often I tended to represent families of criminal defendants. I am very sympathetic to the position in which you all find yourself as well and the challenges of that. And you have the Court's understanding and empathy for that.

THE DEFENDANT:  Thank you, Your Honor.

MR. BACHNER:  Thanks, Judge.

THE COURT:  With that, unless there is anything further, we'll stand adjourned.  Thank you.

MR. MURRAY:  Thank you, Your Honor.

(Proceedings concluded at 2:01 p.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Ann Marie Mitchell, CRR, RDR, RMR
Official Court Reporter

**$100** [1] - 53:18
**$12** [1] - 32:18
**$128** [1] - 32:18
**$210,000** [1] - 53:10
**$230,000** [1] - 36:2
**$30,000** [1] - 50:11
**$89,000** [1] - 30:18
**$89,600** [3] - 8:10, 26:6, 53:22
**$90,000** [2] - 13:13, 13:15
**0** [4] - 7:8, 7:13, 7:16, 40:19
**1** [3] - 6:21, 7:11, 7:13
**1,000** [1] - 32:2
**1.2** [1] - 32:25
**1.5** [1] - 36:12
**10** [1] - 54:22
**10006** [1] - 2:4
**11** [1] - 49:13
**113** [1] - 39:23
**12** [6] - 6:21, 7:19, 9:18, 29:11, 34:22, 35:25
**1250** [1] - 1:16
**12:33** [2] - 1:9, 3:1
**13** [7] - 6:4, 6:20, 6:25, 7:2, 7:5, 29:11, 36:6
**14** [5] - 6:5, 49:15, 49:25, 54:23, 54:24
**15** [1] - 51:9
**16** [1] - 1:8
**1610** [1] - 2:4
**18** [10] - 6:21, 7:19, 9:18, 29:11, 34:22, 36:6, 36:10, 44:22, 50:23, 55:9
**19-478** [1] - 3:6
**19106** [2] - 1:8, 1:17
**1953** [1] - 31:14
**1984** [1] - 50:18
**1990** [1] - 32:17
**1998** [1] - 32:17
**1999** [1] - 26:17
**1:34** [1] - 44:18
**1:44** [1] - 44:18
**2** [1] - 54:5
**2.3** [1] - 39:23
**20** [1] - 14:18
**2004** [1] - 33:1
**2005** [1] - 11:8
**2011** [1] - 11:8
**2013** [2] - 11:6, 28:21
**2020** [3] - 1:8, 4:20, 54:6
**212** [1] - 2:5
**215** [1] - 1:17
**24** [1] - 36:10
**24/7** [1] - 38:1
**25** [2] - 39:20, 39:22
**267** [1] - 1:22
**299-7250** [1] - 1:22
**2:00** [1] - 54:8
**2:01** [1] - 58:6

**2:19-cr-00471** [1] - 1:3
**2T1** [1] - 47:9
**2T1.1** [1] - 13:23
**3.5** [1] - 40:18
**30** [5] - 32:8, 53:12, 53:14, 56:1, 57:17
**31** [2] - 11:8, 24:17
**33** [1] - 32:8
**344-7778** [1] - 2:5
**3553** [1] - 34:14
**3553(a** [2] - 9:15, 28:2
**3553(a)** [1] - 44:22
**39** [1] - 2:3
**4** [2] - 24:18, 50:6
**5** [3] - 14:18, 39:20, 39:21
**5E1.2** [1] - 50:7
**60** [1] - 39:13
**601** [1] - 1:7
**615** [1] - 1:16
**67-year-old** [2] - 26:16, 40:10
**7** [1] - 4:20
**72** [1] - 50:24
**8** [2] - 49:15, 49:25
**85** [1] - 31:16
**861-8474** [1] - 1:17
**abilities** [1] - 41:21
**ability** [2] - 17:4, 21:22
**able** [3] - 17:8, 17:10, 17:13
**above-entitled** [1] - 58:11
**absences** [1] - 51:17
**absolutely** [2] - 28:23, 47:15
**acceptance** [1] - 6:6
**accepted** [1] - 43:2
**access** [2] - 29:12, 51:24
**accident** [1] - 26:23
**accommodation** [1] - 45:17
**accompany** [1] - 22:8
**according** [1] - 42:22
**account** [8] - 11:2, 11:5, 11:14, 13:15, 19:12, 23:11, 46:1, 48:4
**accurate** [1] - 6:20
**acknowledge** [2] - 46:17, 49:1
**acknowledging** [1] - 43:23
**act** [2] - 14:7, 44:4
**Act** [2] - 50:18, 57:3
**acted** [1] - 43:4
**ACTION** [1] - 1:3
**actions** [2] - 43:11, 44:3
**active** [1] - 38:24
**acts** [2] - 10:19, 39:3
**added** [1] - 5:19
**addition** [5] - 10:8, 10:14, 11:15, 17:23, 51:12
**additional** [2] - 46:11, 53:1
**address** [8] - 9:5, 17:1, 18:19, 20:18, 26:14, 42:11, 42:14, 53:15

**addressed** [8] - 10:4, 10:24, 16:23, 17:3, 18:11, 22:10, 28:2, 40:22
**addressing** [1] - 16:14
**adequate** [1] - 17:21
**adjourned** [1] - 58:4
**administration** [1] - 40:4
**administrative** [1] - 56:17
**admit** [1] - 24:17
**adopted** [1] - 51:8
**advance** [1] - 4:1
**advantage** [1] - 41:20
**advantages** [1] - 21:20
**advice** [1] - 54:18
**advocate** [1] - 25:9
**affected** [1] - 30:12
**affiliated** [1] - 17:14
**affirmatively** [1] - 19:10
**afford** [3] - 38:4, 54:25, 55:1
**afforded** [2] - 25:5, 36:24
**afternoon** [8] - 3:2, 3:4, 3:12, 3:13, 3:16, 3:17, 3:19, 24:14
**age** [3] - 31:16, 32:8, 42:19
**Agent** [1] - 3:20
**ago** [6] - 28:22, 31:15, 31:20, 32:8, 39:12, 40:20
**agree** [3] - 15:19, 28:16, 45:25
**agreement** [10] - 6:8, 6:9, 6:11, 7:1, 7:15, 7:18, 8:11, 8:18, 15:15, 46:20
**ahead** [3] - 18:20, 20:23, 21:1
**aided** [1] - 1:24
**alleviate** [1] - 40:5
**allowable** [1] - 52:12
**almost** [1] - 36:2
**alone** [1] - 27:1
**amended** [1] - 52:9
**AMERICA** [1] - 1:3
**America** [1] - 1:19
**American** [1] - 39:11
**Americans** [2] - 39:23, 39:24
**amount** [8] - 8:9, 13:18, 45:10, 48:12, 49:17, 50:8, 50:14, 53:21
**analysis** [3] - 18:23, 22:14, 25:11
**analyze** [1] - 21:18
**anarchy** [1] - 30:5
**anecdotal** [1] - 35:1
**anecdotally** [1] - 17:12
**Ann** [2] - 1:21, 58:14
**announce** [1] - 44:16
**answer** [1] - 29:2
**answered** [2] - 5:9, 11:9
**anticipating** [1] - 18:21
**antithesis** [1] - 33:6
**apologies** [1] - 44:3

**apologize** [4] - 3:25, 43:17, 55:13, 57:6
**appeal** [5] - 54:20, 54:21, 55:1, 55:2
**Appeals** [1] - 8:8
**appear** [1] - 21:15
**appearance** [1] - 31:23
**appearances** [1] - 3:7
**APPEARANCES** [2] - 1:13, 2:1
**appellate** [2] - 54:13, 54:18
**applicable** [1] - 14:13
**application** [2] - 50:6, 50:12
**apply** [1] - 14:24
**appoint** [1] - 54:25
**appreciate** [10] - 9:13, 13:10, 17:2, 17:5, 19:13, 21:8, 24:15, 30:2, 44:12, 57:20
**appropriate** [13] - 9:24, 22:3, 26:19, 27:5, 28:13, 29:14, 29:20, 41:15, 49:12, 49:22, 50:4, 54:4, 56:10
**approval** [2] - 53:2, 53:7
**approved** [1] - 51:17
**area** [3] - 38:14, 38:20, 39:2
**argue** [3] - 25:10, 28:8, 36:17
**argued** [1] - 11:18
**argues** [1] - 47:21
**arguing** [1] - 15:1
**argument** [3] - 15:6, 47:1, 48:5
**arguments** [2] - 19:15, 29:18
**arise** [1] - 19:23
**array** [2] - 19:3, 20:19
**arrested** [1] - 40:21
**articles** [1] - 17:16
**ashamed** [2] - 43:11
**Ashley** [2] - 37:18, 37:19
**Ashley's** [1] - 37:25
**assessed** [1] - 27:15
**assessment** [3] - 27:4, 27:25, 53:18
**assets** [2] - 52:15, 53:6
**associates** [1] - 10:22
**ASSOCIATES** [1] - 2:2
**assume** [3] - 4:6, 8:23, 42:11
**assumption** [1] - 15:10
**ATM** [3] - 11:4, 28:24, 29:12
**attack** [2] - 31:16, 35:3
**attempting** [1] - 34:16
**attendant** [2] - 34:7, 34:22
**attended** [2] - 39:10, 39:11
**Attorney** [1] - 53:13
**ATTORNEY'S** [1] - 1:14
**Attorney's** [1] - 3:10
**authorize** [1] - 49:8
**authorized** [2] - 51:20, 53:24
**available** [7] - 17:7, 17:14, 17:25, 20:19, 23:3, 23:7,

48:4
**avarice** [1] - 45:11
**avoid** [7] - 41:16, 45:9, 46:14, 56:1, 56:5, 56:6
**awaiting** [1] - 43:7
**aware** [6] - 9:4, 13:20, 17:18, 24:8, 48:1, 48:21
**BACHNER** [27] - 2:2, 2:3, 3:13, 4:23, 6:12, 7:3, 7:17, 7:23, 8:4, 8:19, 24:6, 24:10, 24:16, 44:14, 54:20, 54:24, 55:20, 55:22, 56:8, 56:14, 56:16, 56:19, 57:2, 57:5, 57:10, 57:12, 58:2
**Bachner** [23] - 3:14, 3:16, 4:22, 5:6, 5:12, 6:2, 6:11, 7:1, 7:15, 7:22, 8:3, 8:18, 21:17, 23:17, 24:5, 42:8, 42:12, 44:13, 45:13, 46:17, 47:1, 48:19, 54:13
**Bachner's** [1] - 47:20
**bad** [6] - 25:24, 26:1, 26:5, 27:18, 29:22, 29:23
**bail** [1] - 54:10
**balance** [1] - 27:17
**bank** [4] - 11:2, 13:14, 19:11, 39:13
**bare** [1] - 17:11
**base** [3] - 6:4, 6:25, 7:4
**based** [1] - 36:18
**basic** [1] - 27:18
**basis** [1] - 54:11
**became** [1] - 37:21
**become** [1] - 39:15
**becomes** [1] - 40:9
**becoming** [1] - 37:20
**bedbound** [1] - 23:8
**BEFORE** [1] - 1:11
**beginning** [1] - 13:22
**begins** [1] - 37:17
**behalf** [2] - 3:14, 16:25
**behavior** [1] - 44:4
**beings** [1] - 40:6
**belabor** [2] - 27:8, 38:13
**below** [2] - 20:7, 47:25
**benchmark** [1] - 9:22
**benefit** [1] - 22:24
**Berman** [1] - 38:21
**beside** [1] - 43:21
**best** [1] - 57:15
**better** [6] - 17:13, 31:7, 37:8, 40:2, 40:7, 47:23
**between** [1] - 16:16
**big** [1] - 4:11
**billion** [1] - 32:25
**bipartisan** [2] - 40:5, 40:10
**bit** [2] - 31:20, 57:21
**blessed** [1] - 42:25
**blowback** [1] - 32:4

**bone** [1] - 19:25
**BOP** [10] - 17:8, 17:10, 17:12, 17:17, 34:16, 34:25, 35:14, 56:19, 56:23
**BOP's** [1] - 35:1
**border** [2] - 19:11, 28:24
**born** [1] - 31:13
**Boston** [1] - 35:8
**boy** [2] - 30:25, 32:3
**Boy** [1] - 32:14
**break** [1] - 12:6
**breast** [1] - 31:17
**briefly** [1] - 31:13
**bring** [2] - 11:16, 33:16
**brings** [1] - 38:4
**broad** [2] - 13:2, 49:2
**Broadway** [1] - 2:3
**brother** [4] - 31:19, 32:8, 37:19, 39:1
**brother's** [1] - 34:9
**brothers** [1] - 36:10
**brought** [7] - 32:17, 33:6, 33:15, 33:19, 42:21, 43:12, 43:25
**building** [1] - 46:4
**bunch** [3] - 26:18, 30:20, 35:20
**bunches** [1] - 32:19
**burdens** [1] - 46:11
**Bureau** [9] - 17:4, 17:20, 47:25, 48:2, 50:20, 50:25, 54:7, 56:7, 56:11
**bush** [1] - 30:6
**businesspeople** [1] - 13:7
**Byrne** [1] - 1:7
**calculated** [2] - 6:3, 8:10
**calculation** [1] - 6:20
**calculations** [1] - 5:25
**calculus** [1] - 47:5
**Calphalon** [1] - 32:15
**camps** [2] - 17:25, 35:12
**campuses** [1] - 18:6
**Canada** [2] - 11:4, 28:24
**cancer** [2] - 31:17, 37:22
**candidly** [1] - 29:6
**cannabis** [1] - 32:16
**care** [14] - 16:24, 17:5, 17:7, 17:9, 17:11, 17:13, 17:21, 32:3, 35:6, 37:20, 47:18, 47:21, 47:25, 51:19
**career** [3] - 10:22, 29:18, 40:12
**careful** [1] - 29:7
**cares** [1] - 38:8
**caring** [1] - 37:9
**Carolina** [1] - 35:8
**carries** [1] - 22:9
**carry** [1] - 43:10
**case** [20] - 11:13, 11:17,

12:7, 13:12, 14:6, 15:3, 16:9, 19:5, 20:10, 26:5, 28:11, 28:20, 35:23, 36:3, 36:9, 41:23, 48:20, 48:22, 53:11, 54:4
**cases** [17] - 13:25, 17:12, 17:13, 19:6, 19:14, 19:15, 25:1, 25:3, 25:4, 35:20, 36:20, 36:22, 40:14, 47:11, 48:14, 48:18, 48:21
**cash** [2] - 11:5, 28:23
**cashers** [1] - 36:11
**catching** [1] - 55:16
**category** [4] - 6:21, 7:11, 7:12, 7:13
**catering** [1] - 34:17
**caught** [1] - 16:5
**caused** [1] - 50:8
**CEOs** [2] - 13:6, 13:7
**certainly** [25] - 8:22, 8:24, 11:10, 15:24, 18:10, 20:8, 21:12, 22:2, 22:7, 22:16, 22:24, 29:15, 37:18, 41:24, 42:9, 42:12, 45:14, 47:22, 47:23, 48:5, 48:21, 48:22, 49:1, 57:1, 57:8
**certainty** [2] - 14:19, 16:10
**certify** [1] - 58:10
**cetera** [2] - 32:23, 56:22
**challenges** [1] - 57:24
**chance** [5] - 4:25, 5:3, 5:5, 11:6, 44:7
**change** [1] - 53:14
**changed** [1] - 5:17
**characteristic** [1] - 26:20
**characteristics** [5] - 26:22, 27:3, 27:22, 41:20, 45:2
**characterization** [1] - 36:13
**charged** [1] - 41:5
**charges** [1] - 53:1
**charitable** [9] - 29:13, 35:18, 36:5, 36:19, 36:22, 37:1, 37:9, 37:16
**charitably** [1] - 43:4
**charities** [2] - 37:8, 38:24
**charity** [5] - 37:17, 37:18, 38:18, 38:19, 40:12
**check** [1] - 36:11
**Chestnut** [1] - 1:16
**children** [6] - 30:22, 31:19, 37:4, 38:16, 43:20, 45:8
**choice** [1] - 46:10
**choose** [1] - 44:6
**Circuit** [8] - 25:3, 36:5, 36:9, 36:12, 36:17, 36:25, 41:5, 48:24
**Circuit's** [1] - 48:23
**circumstance** [1] - 15:17
**circumstances** [5] - 10:3, 15:25, 26:21, 27:1, 45:1

**cited** [9] - 14:13, 14:23, 16:3, 16:18, 25:2, 31:6, 35:19, 36:20, 36:22
**citing** [2] - 17:17, 36:4
**citizens** [1] - 46:15
**claim** [1] - 52:12
**clarify** [1] - 55:7
**clarity** [1] - 6:23
**clause** [2] - 28:2, 41:25
**clean** [1] - 6:2
**clear** [6] - 4:15, 10:18, 21:13, 23:23, 30:23, 31:5
**clearly** [4] - 11:20, 12:2, 12:3, 23:2
**Clerk** [2] - 49:8, 53:23
**clerking** [1] - 39:15
**clients** [2] - 30:6, 30:24
**close** [1] - 56:21
**clung** [1] - 43:7
**code** [1] - 46:10
**cold** [1] - 42:3
**collateral** [1] - 22:9
**colleagues** [2] - 37:11, 43:15
**College** [1] - 39:11
**commence** [1] - 54:8
**commencement** [1] - 51:10
**Commencing** [1] - 1:9
**commencing** [1] - 51:15
**commensurate** [1] - 14:6
**commentary** [2] - 13:22, 50:5
**comments** [1] - 47:9
**commit** [5] - 10:25, 40:18, 40:24, 46:22, 51:4
**committed** [8] - 26:3, 26:5, 39:4, 39:13, 43:2, 43:21, 45:7, 50:20
**committing** [2] - 29:11, 42:20
**common** [2] - 14:14, 14:16
**community** [20] - 11:23, 11:25, 18:12, 20:5, 20:13, 20:17, 28:13, 28:15, 30:21, 38:24, 40:12, 40:15, 41:21, 43:16, 44:8, 45:18, 45:20, 46:2, 48:6, 51:18
**community-related** [1] - 38:24
**company** [6] - 11:3, 32:15, 32:16, 32:17, 32:25
**comparing** [1] - 19:2
**comparison** [1] - 18:25
**completely** [2] - 18:13, 30:6
**compliance** [1] - 53:3
**comply** [4] - 51:7, 51:12, 52:3, 52:17
**computer** [1] - 1:24
**computer-aided** [1] - 1:24
**conceded** [1] - 47:23

concern [3] - 15:14, 23:25, 46:23
concerned [4] - 15:4, 15:25, 20:14, 56:5
concerns [1] - 20:21
concession [1] - 45:5
concluded [2] - 7:8, 58:6
condition [1] - 20:16
conditions [5] - 17:3, 29:13, 51:7, 51:13, 52:4
conduct [17] - 10:8, 10:10, 12:5, 19:9, 25:25, 26:4, 26:14, 33:11, 33:16, 34:1, 35:24, 36:5, 37:2, 41:5, 43:5, 46:12
confined [1] - 51:14
confinement [28] - 12:18, 12:21, 14:22, 14:25, 15:2, 15:6, 16:17, 18:11, 18:12, 19:20, 20:5, 20:10, 20:13, 20:16, 20:17, 22:1, 24:3, 29:25, 48:6, 48:7, 52:4, 55:10, 55:15, 56:1, 56:3, 56:4
confirm [2] - 8:14, 9:10
Congress [3] - 26:25, 27:20, 46:9
Congress's [1] - 46:14
conjunctive [2] - 26:24, 27:2
consequences [1] - 22:10
consider [9] - 8:25, 13:21, 15:22, 27:21, 31:6, 44:21, 46:6, 55:25, 56:2
consideration [2] - 14:3, 34:15
considered [3] - 35:18, 48:13, 56:9
consultant [1] - 21:18
consultants [1] - 18:25
Consulting [1] - 41:3
consulting [1] - 25:8
contemplating [1] - 9:3
context [1] - 27:15
continue [3] - 28:14, 40:15
CONTINUED [1] - 2:1
continued [1] - 44:9
continues [1] - 37:23
contractor [1] - 35:25
contributions [1] - 37:16
control [2] - 47:4
controlled [1] - 51:6
converting [1] - 55:25
conviction [1] - 26:16
convinced [1] - 38:15
COOLEY [1] - 1:5
Cooley [65] - 3:5, 3:14, 3:17, 4:6, 4:12, 4:24, 11:13, 15:12, 16:10, 17:22, 17:24, 18:3, 18:7, 18:10, 21:24, 22:9, 23:17, 23:21, 26:5, 26:11,

28:21, 29:2, 29:3, 29:15, 29:22, 30:10, 30:17, 31:8, 31:13, 32:3, 33:2, 34:23, 35:2, 35:5, 35:9, 35:19, 35:21, 36:4, 37:2, 37:9, 39:4, 39:9, 40:13, 40:17, 40:18, 40:19, 40:21, 40:25, 41:5, 42:4, 42:6, 42:9, 44:12, 45:6, 45:13, 46:21, 49:5, 49:17, 50:19, 54:2, 54:9, 54:14, 54:20, 57:13
Cooley's [8] - 24:1, 24:10, 32:7, 34:20, 37:18, 41:19, 47:5, 53:22
cooperate [3] - 52:8, 52:15, 52:21
cooperation [1] - 19:17
copy [2] - 4:19, 4:24
cordless [1] - 52:1
corporations [1] - 12:1
correct [7] - 11:7, 16:12, 28:23, 44:7, 52:12, 56:8, 58:10
correctional [1] - 47:18
costs [2] - 40:7, 52:6
counsel [4] - 3:8, 4:18, 11:18, 55:5
countries [1] - 40:1
country [1] - 41:19
couple [1] - 5:24
coupled [1] - 47:6
course [3] - 25:25, 31:8, 42:17
COURT [1] - 1:1
Court [9] - 1:22, 3:1, 9:20, 27:23, 28:5, 30:23, 41:23, 49:9, 58:14
court [4] - 10:11, 12:3, 27:9, 51:7
court's [1] - 49:6
Court's [4] - 9:19, 36:15, 56:22, 57:25
courthouse [1] - 11:11
Courthouse [1] - 1:7
Courts [1] - 41:1
courts [6] - 9:10, 19:13, 25:13, 27:21, 40:4, 41:18
courtyard [1] - 35:2
cover [2] - 8:6, 55:17
crazy [1] - 34:3
created [1] - 22:23
creating [2] - 32:18, 32:22
creative [1] - 39:8
credentials [1] - 32:12
credit [7] - 13:17, 27:14, 33:11, 53:1, 57:17
crime [19] - 10:5, 10:25, 12:11, 26:3, 32:20, 39:4, 40:18, 40:24, 42:20, 43:2, 43:6, 43:21, 45:4, 45:6, 45:7,

46:9, 46:16, 51:4
crimes [6] - 11:12, 26:3, 34:7, 46:22, 47:13, 47:15
CRIMINAL [1] - 1:3
criminal [13] - 6:20, 7:6, 7:8, 7:11, 7:12, 7:16, 14:1, 14:6, 24:16, 26:13, 35:11, 57:21, 57:22
criteria [3] - 26:18, 26:20, 26:24
criticism [1] - 17:20
CRR [2] - 1:21, 58:14
custodial [2] - 56:6, 56:11
custody [2] - 50:20, 50:24
custom [1] - 52:1
cut [1] - 20:22
dad [6] - 31:14, 31:15, 33:4, 33:21, 37:20, 38:3
daddy [1] - 33:20
daily [1] - 43:7
damaged [1] - 46:2
dangerous [2] - 31:25, 51:5
Data [1] - 41:3
date [3] - 11:7, 11:8, 56:2
dated [1] - 4:20
daughter [1] - 24:11
David [1] - 38:17
days [7] - 51:10, 53:12, 53:14, 54:22, 54:24, 56:1, 57:17
de [1] - 34:21
deal [5] - 4:11, 9:8, 14:22, 34:10, 48:5
dealing [2] - 20:15, 37:5
dealings [2] - 30:22, 52:23
debilitating [1] - 43:9
decades [1] - 37:6
December [1] - 11:8
decent [1] - 27:11
decide [2] - 12:8, 55:1
decides [1] - 12:19
decision [8] - 25:19, 29:3, 29:23, 31:22, 31:25, 32:5, 35:14, 42:12
decisions [2] - 29:22, 48:23
declare [2] - 11:6, 30:18
dedicated [1] - 32:9
dedication [1] - 33:3
deeply [1] - 43:16
Defendant [1] - 2:6
defendant [59] - 7:14, 8:24, 10:6, 10:13, 10:15, 10:19, 10:25, 11:2, 12:5, 12:23, 13:8, 13:10, 13:17, 15:16, 15:22, 17:2, 17:6, 19:1, 19:2, 19:8, 21:7, 22:22, 22:25, 23:5, 26:21, 26:22, 27:3, 27:22, 45:3, 47:15, 47:17, 50:19, 50:22, 50:25, 51:1, 51:3, 51:9, 51:12, 51:14,

51:16, 51:22, 51:24, 52:3, 52:6, 52:8, 52:11, 52:13, 52:15, 52:18, 52:21, 52:25, 53:2, 53:5, 53:9, 53:13, 53:17, 53:20, 54:6
DEFENDANT [14] - 4:8, 4:14, 4:16, 5:1, 5:4, 5:7, 5:10, 5:14, 5:18, 5:21, 42:15, 42:18, 55:3, 58:1
defendant's [4] - 11:22, 22:17, 36:18, 47:20
defendants [8] - 11:11, 11:12, 19:2, 21:15, 25:6, 41:13, 57:21, 57:22
defenders [1] - 35:10
defense [11] - 10:18, 11:18, 14:9, 15:1, 15:10, 15:24, 18:16, 19:4, 24:17, 41:9, 55:19
defense's [1] - 15:6
degree [2] - 14:25, 22:2
delay [1] - 12:7
delinquent [1] - 52:9
deliver [1] - 54:13
demean [2] - 34:16, 34:21
dementia [1] - 37:3
demonstrated [3] - 25:24, 40:11, 46:14
demonstrates [1] - 45:11
departure [10] - 6:15, 9:3, 9:11, 9:12, 19:17, 28:17, 36:8, 50:4, 50:9, 50:16
depressed [1] - 30:14
deprive [1] - 46:13
describe [1] - 30:7
deserve [1] - 43:25
deserves [1] - 10:12
designated [1] - 54:7
despite [1] - 43:21
detection [3] - 45:9, 47:4, 47:6
detention [4] - 20:5, 20:14, 20:17, 50:3
deter [1] - 48:14
determinative [1] - 23:12
determined [1] - 51:11
deterrence [28] - 11:16, 11:19, 11:21, 12:10, 12:15, 13:19, 13:24, 14:9, 14:17, 15:4, 15:7, 15:8, 15:14, 15:18, 15:20, 15:22, 15:23, 16:2, 16:3, 16:16, 30:16, 33:14, 40:22, 46:20, 46:24, 46:25, 47:10, 49:20
deterrent [7] - 12:13, 14:7, 15:1, 16:6, 16:11, 41:2, 47:2
deterring [2] - 14:2, 40:17
developed [2] - 13:2, 37:22
device [2] - 51:5, 51:23
devising [1] - 39:8

**died** [4] - 31:15, 31:20, 32:8, 37:19
**difference** [1] - 16:16
**different** [9] - 11:10, 13:16, 13:17, 16:14, 18:6, 21:25, 23:4, 29:8, 43:15
**differently** [3] - 33:12, 35:22, 48:25
**difficult** [1] - 25:21
**digress** [1] - 31:21
**direct** [1] - 53:6
**directed** [2] - 27:20, 54:6
**direction** [1] - 51:15
**directly** [2] - 14:13, 43:18
**disagree** [2] - 16:13, 24:21
**disappear** [1] - 18:13
**disclosure** [1] - 52:19
**discount** [1] - 22:16
**discretion** [2] - 49:2, 49:25
**discuss** [2] - 5:11, 5:12
**discussed** [1] - 42:11
**disease** [1] - 30:7
**disparities** [2] - 18:17, 48:17
**disparity** [2] - 19:21, 25:13
**disparity-related** [1] - 25:13
**dispute** [1] - 10:17
**distinction** [1] - 16:19
**distributions** [1] - 11:3
**District** [1] - 21:19
**DISTRICT** [2] - 1:1, 1:1
**district** [2] - 51:1, 53:14
**dollars** [1] - 38:19
**done** [18] - 10:19, 18:23, 18:25, 27:14, 29:17, 32:21, 33:10, 33:25, 34:3, 35:1, 37:5, 38:16, 39:7, 43:25, 45:15, 45:17, 46:3, 57:16
**double** [1] - 28:18
**doubt** [4] - 12:23, 16:4, 20:11, 47:22
**down** [4] - 10:14, 12:20, 25:4, 49:13
**downward** [2] - 6:15, 8:25
**Dr** [1] - 38:13
**drug** [1] - 51:9
**due** [4] - 52:10, 52:16, 53:11, 53:19
**during** [1] - 52:10
**DWI** [1] - 26:16
**earn** [1] - 32:22
**EASTERN** [1] - 1:1
**Eastern** [1] - 21:18
**economic** [3] - 12:11, 46:16, 46:18
**ed** [1] - 31:19
**educational** [2] - 47:17, 51:19
**effect** [3] - 14:11, 26:6, 57:4
**effective** [1] - 34:15

**effort** [2] - 46:14, 47:8
**efforts** [2] - 35:1, 37:14
**egregious** [2] - 25:4, 36:23
**eight** [3] - 40:7, 55:25, 56:3
**eight-month** [1] - 55:25
**either** [3] - 19:19, 33:24, 35:8
**electronic** [3] - 51:22, 51:23, 52:6
**elementary** [1] - 27:17
**eloquent** [1] - 27:23
**embarrassed** [2] - 30:21, 33:9
**embarrassment** [1] - 43:13
**Emilia** [1] - 31:18
**emotional** [2] - 30:13
**emotionally** [2] - 23:2, 43:8
**empathy** [1] - 57:25
**employees** [1] - 45:23
**employment** [1] - 51:18
**empty** [1] - 13:14
**encourage** [1] - 42:13
**encumber** [1] - 53:5
**end** [6] - 11:7, 17:7, 19:13, 30:5, 35:9, 40:3
**ended** [1] - 39:14
**engage** [2] - 12:5, 13:7
**engaged** [3] - 19:9, 35:24, 37:2
**engaging** [1] - 11:12
**enhancement** [1] - 6:5
**enormous** [1] - 45:15
**ensure** [1] - 45:7
**entitled** [1] - 58:11
**entity** [1] - 11:7
**environment** [2] - 18:8, 34:23
**environments** [1] - 35:16
**envision** [1] - 50:8
**equipment** [1] - 52:2
**ESQUIRE** [3] - 1:15, 1:15, 2:3
**essentially** [4] - 10:6, 10:9, 26:3, 37:20
**estimated** [1] - 14:1
**et** [2] - 32:22, 56:22
**event** [1] - 43:13
**eventual** [1] - 13:5
**eventually** [1] - 39:14
**exactly** [3] - 7:12, 17:8, 57:14
**example** [3] - 13:13, 19:4, 48:23
**exceeds** [1] - 50:9
**excellent** [1] - 21:17
**except** [1] - 51:17
**execution** [1] - 54:4
**Exhibit** [3] - 38:14, 38:17, 38:21
**exhibited** [1] - 33:25
**expect** [1] - 38:10

**expectation** [1] - 50:12
**expenses** [1] - 52:13
**experience** [2] - 17:9, 44:9
**experienced** [1] - 21:12
**explanation** [1] - 28:25
**express** [2] - 44:2, 53:7
**extended** [1] - 45:16
**extent** [1] - 22:11
**extraordinary** [1] - 37:16
**extremely** [4] - 13:8, 35:18, 35:23, 36:19
**face** [1] - 6:16
**facilitate** [1] - 56:22
**facilities** [4] - 17:25, 18:1, 18:4
**facility** [1] - 18:3
**facing** [1] - 42:20
**fact** [5] - 11:14, 17:24, 39:18, 48:24, 49:21
**factor** [8] - 10:2, 10:14, 11:19, 22:13, 27:21, 46:6, 47:3, 47:14
**factors** [6] - 9:15, 10:2, 27:6, 34:14, 44:21, 44:23
**facts** [3] - 19:7, 28:1, 28:20
**failed** [1] - 43:3
**failures** [2] - 17:17, 17:19
**fair** [4] - 17:21, 25:20, 27:5, 29:9
**fairer** [1] - 25:12
**fairly** [2] - 17:7, 32:15
**false** [2] - 10:7, 28:22
**familiar** [3] - 9:19, 17:12, 20:11
**families** [2] - 38:7, 57:22
**family** [14] - 10:21, 23:6, 24:7, 24:13, 38:23, 39:24, 42:21, 43:14, 43:18, 43:23, 45:16, 45:17, 45:22, 57:19
**far** [3] - 5:25, 28:24, 40:22
**father** [1] - 42:24
**fault** [1] - 32:5
**fear** [1] - 13:4
**federal** [6] - 10:11, 39:15, 40:4, 41:13, 41:18, 51:4
**feed** [1] - 38:20
**fellow** [1] - 39:12
**few** [2] - 39:10, 42:5
**fighting** [2] - 15:13, 15:17
**fights** [1] - 24:19
**figure** [1] - 8:11
**file** [1] - 54:21
**filed** [1] - 36:11
**filing** [2] - 52:9, 52:10
**filings** [1] - 36:1
**fill** [1] - 35:25
**final** [1] - 20:24
**finally** [1] - 41:3
**financial** [7] - 11:13, 12:13,

23:3, 24:1, 42:25, 52:19, 52:22
**fine** [24] - 4:2, 4:4, 9:4, 13:8, 13:9, 21:11, 23:23, 23:25, 28:17, 42:5, 46:17, 48:12, 48:14, 49:19, 50:5, 50:9, 50:10, 50:11, 50:13, 50:15, 53:6, 53:10, 53:11, 53:15
**fines** [3] - 48:7, 50:13, 53:3
**finger** [1] - 29:9
**firearm** [1] - 51:5
**First** [1] - 57:3
**first** [9] - 9:7, 26:20, 42:16, 45:1, 50:2, 55:6, 55:9, 55:15
**five** [3] - 41:6, 44:15, 44:17
**five-minute** [1] - 44:17
**fix** [3] - 34:5, 34:12, 35:24
**flag** [1] - 8:22
**flip** [1] - 12:8
**Florida** [1] - 56:21
**focus** [2] - 35:17
**follow** [3] - 15:5, 41:17, 51:23
**followed** [1] - 50:2
**following** [1] - 51:13
**foregoing** [1] - 58:10
**foreign** [1] - 19:11
**forever** [1] - 39:6
**forget** [1] - 30:8
**forgive** [1] - 7:9
**former** [1] - 13:7
**formidable** [1] - 24:19
**forth** [2] - 17:15, 44:21
**fortunate** [1] - 24:1
**forward** [3] - 3:24, 4:13, 44:6
**four** [2] - 5:4, 33:8
**frankly** [7] - 11:24, 19:24, 21:13, 21:23, 25:22, 26:9, 47:3
**freaked** [1] - 38:1
**free** [1] - 38:15
**frequent** [1] - 17:12
**frequently** [1] - 20:1
**friend** [1] - 38:21
**friends** [6] - 10:22, 33:25, 39:24, 43:14, 43:20, 45:22
**front** [4] - 26:8, 27:24, 33:5, 36:23
**full** [3] - 20:8, 52:19, 53:12
**fully** [2] - 52:8, 52:15
**fundamentally** [1] - 26:12
**furnish** [1] - 52:13
**future** [5] - 26:2, 27:17, 47:12, 47:15, 52:10
**gain** [1] - 47:7
**gainful** [1] - 51:18
**Gall** [3] - 28:3, 30:23, 31:5
**gather** [1] - 3:20
**geez** [1] - 37:7

**genera** [1] - 46:25
**general** [10] - 11:21, 15:8, 15:18, 15:23, 16:2, 16:3, 35:25, 40:22, 48:21, 49:20
**General** [1] - 48:1
**generally** [3] - 6:1, 16:11, 33:15
**generational** [1] - 45:6
**gentleman** [1] - 26:8
**gilding** [2] - 57:7
**given** [6] - 27:6, 34:20, 34:24, 37:3, 37:14, 48:8
**gladly** [1] - 43:1
**glass** [1] - 42:16
**go-to** [1] - 39:15
**goals** [3] - 28:6, 28:10, 42:1
**God** [1] - 30:4
**government** [30] - 3:10, 4:19, 6:1, 6:8, 6:9, 6:15, 6:17, 6:18, 7:24, 8:11, 9:11, 10:11, 10:17, 16:25, 20:6, 21:23, 22:13, 23:20, 24:25, 25:2, 26:6, 34:3, 46:13, 47:9, 47:22, 49:4, 49:10, 54:2, 55:6, 55:17
**Government** [3] - 30:3, 30:20, 44:3
**government's** [6] - 9:17, 9:20, 13:4, 23:19, 36:13, 49:18
**grandchildren** [1] - 45:8
**grant** [1] - 6:24
**grateful** [1] - 43:18
**gravity** [1] - 14:6
**great** [7] - 5:23, 10:21, 22:18, 22:19, 24:9, 27:18, 48:5
**great-nephew** [2] - 22:18, 22:19
**greater** [4] - 28:6, 28:8, 28:10, 41:25
**greatest** [1] - 37:12
**greatly** [1] - 43:18
**greed** [1] - 45:6
**greedy** [1] - 29:3
**grows** [1] - 32:25
**guess** [4] - 14:14, 18:2, 22:12, 22:18
**guidance** [1] - 26:19
**guideline** [12] - 6:19, 9:18, 19:6, 19:25, 29:10, 34:21, 36:3, 41:6, 41:14, 50:9, 50:10, 50:11
**guidelines** [15] - 5:25, 6:14, 7:19, 9:22, 9:25, 13:23, 14:4, 44:23, 47:10, 49:25, 50:1, 50:6, 50:7, 50:13
**guilty** [3] - 10:6, 33:13, 34:4
**guy** [6] - 26:5, 27:23, 34:11, 35:21, 37:10, 39:16
**guys** [1] - 3:23

**half** [3] - 13:14, 20:3, 33:8
**hangs** [1] - 27:17
**happy** [2] - 3:25, 30:6
**hard** [6] - 21:8, 24:18, 31:14, 32:19, 38:8, 42:21
**hard-working** [3] - 31:14, 32:19, 42:21
**harsh** [1] - 14:16
**hate** [2] - 24:17, 28:17
**health** [4] - 30:11, 30:12, 40:11
**hear** [6] - 4:10, 8:20, 8:24, 9:7, 45:14, 49:7
**heard** [7] - 3:21, 19:12, 23:16, 44:20, 45:5, 48:5
**hearing** [1] - 49:21
**heart** [2] - 31:16, 35:3
**heartland** [1] - 41:13
**hearts** [1] - 41:9
**heartstrings** [1] - 31:24
**heavily** [1] - 31:17
**held** [2] - 36:7, 45:19
**help** [12] - 16:10, 25:13, 25:15, 31:18, 34:12, 37:4, 38:18, 39:1, 40:15, 41:21
**helped** [3] - 34:10, 37:13, 38:22
**helpful** [1] - 5:20
**helping** [1] - 37:15
**helps** [1] - 32:3
**hereby** [1] - 50:20
**hide** [1] - 36:11
**high** [5] - 17:7, 35:9, 45:19
**high-end** [2] - 17:7, 35:9
**higher** [3] - 16:5, 20:1, 35:13
**highly** [1] - 27:10
**himself** [1] - 33:2
**hire** [3] - 21:16, 21:17, 30:20
**historically** [1] - 26:9
**histories** [1] - 25:25
**history** [14] - 6:21, 7:6, 7:8, 7:11, 7:12, 7:16, 10:15, 10:17, 10:20, 26:22, 27:2, 27:21, 35:11, 45:2
**hitherto** [1] - 27:16
**home** [18] - 12:18, 18:12, 20:5, 20:14, 20:17, 27:9, 35:24, 37:17, 48:6, 50:3, 52:4, 55:10, 55:15, 56:1, 56:3, 56:4, 56:21
**homemaker** [1] - 31:15
**homes** [1] - 37:3
**honest** [1] - 41:11
**honesty** [1] - 33:3
**Honor** [108] - 3:4, 3:9, 3:13, 3:22, 4:16, 4:21, 4:23, 5:1, 5:14, 5:18, 5:22, 6:10, 6:12, 6:18, 7:3, 7:9, 7:10, 7:21, 7:23, 8:2, 8:4, 8:16, 8:19, 9:9, 9:14, 11:10, 11:15,

12:15, 14:15, 15:20, 16:12, 16:21, 18:19, 19:22, 22:15, 23:14, 23:22, 24:6, 24:12, 24:16, 24:24, 25:5, 25:7, 25:11, 25:15, 25:23, 26:2, 26:9, 26:23, 27:10, 28:8, 28:12, 28:16, 28:21, 29:2, 29:5, 29:6, 29:10, 30:5, 31:10, 31:21, 32:7, 32:17, 32:24, 33:2, 33:5, 34:8, 34:13, 34:19, 35:17, 35:23, 36:21, 36:23, 37:11, 37:16, 38:17, 39:3, 39:11, 40:3, 40:9, 40:16, 40:19, 41:2, 41:3, 41:8, 41:10, 41:12, 41:15, 41:17, 42:2, 42:3, 42:5, 42:6, 42:15, 42:18, 44:5, 44:14, 54:15, 55:18, 55:22, 56:2, 56:16, 56:19, 56:20, 58:1, 58:5
**HONORABLE** [1] - 1:11
**honorable** [1] - 44:6
**hope** [1] - 44:6
**hopefully** [1] - 12:7
**hospital** [4] - 17:25, 18:3, 35:4, 35:7
**hospitals** [2] - 17:15, 35:15
**hours** [1] - 50:24
**housed** [2] - 35:9, 56:21
**housekeeping** [1] - 55:20
**human** [5] - 25:20, 26:11, 27:5, 31:9, 40:6
**humiliated** [1] - 33:9
**humiliation** [1] - 43:11
**hundreds** [1] - 38:19
**hungry** [1] - 38:20
**hurting** [1] - 43:22
**hurts** [1] - 43:22
**husband** [1] - 37:25
**idea** [1] - 46:16
**identical** [1] - 41:5
**identically** [1] - 29:19
**identifying** [1] - 19:5
**illegal** [1] - 51:6
**imagine** [1] - 19:14
**imagined** [1] - 42:19
**imitate** [1] - 27:12
**immediate** [1] - 27:14
**immediately** [2] - 53:11, 53:19
**immensely** [1] - 44:4
**impact** [1] - 44:8
**impacted** [2] - 29:24, 30:11
**importance** [2] - 11:21, 13:25
**important** [14] - 11:17, 11:20, 14:25, 18:24, 19:1, 24:12, 32:1, 32:6, 36:21, 37:1, 44:2, 47:11, 49:18, 56:10
**importantly** [1] - 43:9

**impose** [4] - 28:5, 28:10, 34:14, 41:24
**imposed** [4] - 16:6, 55:8, 55:24, 57:4
**imposing** [3] - 9:23, 20:16, 25:19
**imposition** [1] - 54:24
**impoverished** [1] - 29:17
**imprison** [4] - 18:10, 22:8, 39:17, 40:8
**imprisoned** [2] - 17:24, 50:21
**imprisonment** [10] - 12:18, 14:24, 19:19, 20:3, 20:4, 20:12, 23:18, 50:22
**improper** [1] - 29:3
**inadequate** [1] - 48:1
**inappropriate** [4] - 12:20, 14:12, 28:17, 28:19
**incidence** [1] - 14:2
**inclined** [1] - 18:10
**include** [2] - 50:3, 52:20
**includes** [1] - 44:22
**including** [1] - 45:16
**income** [4] - 36:12, 52:12, 52:20, 52:24
**incorrect** [1] - 5:16
**increased** [1] - 46:17
**incredibly** [1] - 33:10
**incurring** [1] - 52:25
**indeed** [1] - 33:5
**Independence** [1] - 1:16
**indicated** [1] - 35:20
**individual** [5] - 13:18, 15:17, 27:25, 29:17, 38:11
**individualized** [2] - 27:4, 27:25
**individuals** [5] - 13:3, 35:10, 41:6, 41:16, 41:19
**inexcusably** [1] - 43:8
**information** [2] - 25:9, 52:14
**initial** [1] - 9:22
**innocent** [1] - 34:6
**insignificant** [1] - 31:7
**Inspector** [1] - 48:1
**instead** [2] - 44:5, 56:2
**institution** [1] - 54:7
**institutions** [1] - 17:18
**insubstantial** [1] - 36:15
**integral** [1] - 4:3
**intention** [1] - 49:16
**interest** [2] - 53:5, 53:11
**interests** [1] - 52:16
**interim** [1] - 54:9
**intermittent** [1] - 20:16
**Internal** [4] - 52:8, 52:14, 53:21, 53:24
**introduce** [1] - 24:7
**introductory** [1] - 13:22

**investigation** [6] - 4:19, 7:25, 29:24, 30:3, 30:19, 52:22
**invoices** [1] - 36:1
**involve** [1] - 20:9
**involved** [5] - 10:9, 20:16, 34:25, 37:8, 43:15
**ironically** [1] - 32:20
**IRS** [3] - 10:6, 10:7, 49:9
**issue** [17] - 11:15, 16:7, 17:3, 18:10, 18:12, 18:16, 23:24, 30:16, 35:5, 39:6, 46:12, 46:24, 46:25, 47:16, 47:19, 48:17, 48:18
**issues** [8] - 25:13, 30:12, 34:10, 34:11, 34:13, 34:20, 36:22, 40:11
**itself** [1] - 20:4
**jail** [12] - 29:11, 31:8, 31:9, 34:18, 35:3, 35:12, 39:9, 39:23, 40:1, 40:6, 41:7
**jails** [3] - 35:9, 35:13, 39:16
**James** [1] - 1:7
**January** [2] - 1:8, 4:20
**Jeffrey** [15] - 31:13, 31:18, 33:7, 34:10, 34:11, 37:23, 38:3, 38:4, 38:10, 38:15, 38:18, 38:23, 38:25, 40:13, 50:19
**JEFFREY** [1] - 1:5
**Jeffrey's** [3] - 31:18, 31:19, 32:9
**Jennifer** [1] - 3:10
**JENNIFER** [1] - 1:15
**jennifer.a.williams@usdoj.gov** [1] - 1:18
**job** [11] - 21:9, 23:7, 24:18, 25:18, 25:21, 30:4, 31:3, 34:17, 37:25, 38:3, 38:4
**jobs** [1] - 32:18
**joined** [1] - 32:15
**JOSEPH** [1] - 1:15
**JOSHUA** [1] - 1:11
**joys** [1] - 49:9
**Judge** [20] - 25:17, 26:15, 27:7, 27:9, 27:13, 27:24, 28:20, 29:19, 29:22, 30:1, 31:13, 34:6, 37:1, 39:3, 39:6, 39:10, 45:25, 56:14, 57:12, 58:2
**judge** [4] - 27:11, 39:15, 42:7, 42:20
**judges** [4] - 41:13, 41:15, 48:24, 48:25
**judgment** [2] - 50:19, 54:1
**justice** [4] - 27:19, 27:24, 36:23, 42:3
**justified** [1] - 34:1
**justifies** [1] - 47:7
**justify** [1] - 36:2

**keep** [1] - 6:2
**Kessler** [1] - 38:13
**kid** [3] - 33:17, 33:19
**kids** [2] - 23:7, 43:22
**kind** [4] - 26:11, 33:23, 34:11, 44:23
**kindness** [1] - 39:4
**kinds** [2] - 48:3, 48:4
**knows** [3] - 12:2, 33:10, 43:22
**La-Z-Boy** [1] - 32:14
**laid** [3] - 26:17, 30:12
**largely** [1] - 15:15
**last** [8] - 15:5, 18:9, 21:3, 24:11, 33:8, 41:11, 43:6, 49:4
**late** [1] - 4:1
**law** [5] - 14:12, 14:14, 14:15, 46:7, 48:22
**Lawrence** [3] - 31:19, 32:7, 37:19
**laws** [4] - 12:6, 14:3, 46:9, 52:17
**Lawson** [4] - 31:25, 37:22, 38:1, 38:5
**lawyer** [6] - 24:19, 30:20, 41:9, 54:25, 55:1
**lawyers** [1] - 5:24
**Lawyers** [1] - 39:12
**leadership** [1] - 12:1
**learned** [2] - 37:12, 44:3
**least** [8] - 6:16, 9:2, 20:12, 20:15, 22:2, 35:11, 50:13, 51:10
**leave** [1] - 38:4
**length** [1] - 16:18
**lengths** [1] - 45:8
**lengthy** [1] - 10:16
**less** [3] - 13:11, 46:12, 46:15
**lesser** [1] - 14:17
**letter** [2] - 34:8, 42:9
**letters** [10] - 10:16, 11:22, 12:24, 21:20, 22:8, 26:10, 37:3, 37:5, 45:12, 45:21
**level** [19] - 6:3, 6:4, 6:25, 7:4, 7:5, 34:20, 35:11, 35:12, 35:13, 35:15, 36:6, 37:15, 46:13, 47:5, 47:25, 48:14, 49:13
**levels** [2] - 18:6, 49:13
**liabilities** [1] - 52:15
**liberty** [1] - 31:12
**license** [1] - 21:10
**life** [10] - 10:21, 21:8, 23:1, 27:15, 29:23, 32:10, 32:11, 39:7, 42:22, 43:10
**lifelong** [1] - 40:11
**lifetime** [2] - 26:1, 32:22
**light** [1] - 24:1

**likely** [1] - 17:6
**lily** [2] - 57:7, 57:8
**limited** [3] - 13:12, 13:25, 31:1
**lines** [1] - 53:1
**liquidate** [1] - 53:5
**list** [2] - 10:15, 11:16
**literally** [2] - 30:13, 38:2
**live** [6] - 30:19, 32:11, 32:12, 42:4, 42:22, 43:3
**lived** [1] - 32:10
**lives** [1] - 45:24
**local** [1] - 51:4
**location** [1] - 56:21
**locations** [1] - 18:5
**lodestone** [1] - 9:25
**look** [4] - 8:13, 26:18, 27:1, 27:2
**looking** [2] - 30:5, 34:24
**looks** [1] - 10:1
**lose** [3] - 21:9, 21:10, 30:21
**loss** [4] - 36:2, 50:8, 50:14, 50:16
**loud** [1] - 54:15
**love** [3] - 40:12, 43:10, 43:14
**loves** [2] - 33:20
**loving** [1] - 37:9
**low** [1] - 35:12
**lower** [2] - 35:15
**lowest** [1] - 28:9
**loyal** [1] - 37:10
**loyalty** [1] - 33:3
**luck** [1] - 57:15
**lying** [2] - 10:6, 19:9
**machine** [1] - 28:24
**Maddie** [1] - 43:20
**Madelyn** [1] - 24:11
**mailing** [1] - 53:14
**main** [2] - 35:17
**maintain** [1] - 51:25
**major** [1] - 11:19
**majority** [1] - 32:11
**Mall** [1] - 1:16
**man** [10] - 26:12, 26:16, 27:13, 28:12, 33:2, 35:24, 37:9, 39:7, 39:14, 40:10
**March** [1] - 54:5
**Marie** [2] - 1:21, 58:14
**Market** [1] - 1:7
**marketer** [1] - 32:14
**Marshals** [1] - 54:7
**match** [1] - 17:8
**material** [1] - 19:10
**matter** [10] - 6:13, 9:9, 14:17, 14:19, 31:7, 41:3, 49:7, 55:20, 56:17, 58:11
**Max** [3] - 24:11, 33:12, 43:20
**max** [2] - 33:12, 55:11
**maximum** [5] - 18:5, 18:7,

50:9, 50:13, 50:15
**mb@bhlawfirm.com** [1] - 2:5
**MCM** [1] - 41:3
**mean** [11] - 11:1, 12:11, 14:24, 15:6, 16:8, 23:4, 27:8, 32:16, 37:4, 57:15
**meaning** [1] - 56:6
**meaningful** [14] - 10:12, 12:6, 12:9, 13:12, 13:20, 15:3, 19:16, 20:10, 21:4, 21:25, 22:21, 24:2, 46:21
**means** [7] - 6:5, 13:13, 28:9, 29:5, 29:6, 34:15, 45:8
**meant** [1] - 42:25
**medical** [10] - 16:24, 17:2, 17:18, 17:20, 34:13, 34:20, 38:15, 47:18, 47:21, 51:19
**medium** [1] - 35:11
**meet** [4] - 24:13, 28:6, 28:10, 42:1
**member** [3] - 11:23, 11:24, 38:23
**members** [2] - 23:6, 24:7
**memo** [8] - 10:18, 18:16, 26:25, 28:2, 30:12, 31:6, 31:20, 35:17
**memorandum** [10] - 8:23, 9:20, 10:4, 10:16, 11:23, 16:2, 19:4, 22:7, 34:16, 49:5
**memos** [1] - 31:23
**mentioned** [3] - 21:4, 23:14, 23:23
**mentored** [1] - 37:21
**mercy** [1] - 42:3
**message** [1] - 20:21
**messages** [1] - 13:6
**met** [1] - 27:10
**MICHAEL** [1] - 2:3
**Michael** [1] - 3:13
**Michigan** [2] - 28:25, 31:14
**might** [4] - 16:9, 17:14, 18:5, 57:5
**million** [5] - 32:18, 36:12, 39:23
**mind** [5] - 4:15, 9:3, 27:20, 30:9, 42:15
**mine** [1] - 32:1
**minimum** [2] - 17:11, 18:1
**minimus** [1] - 34:21
**minute** [1] - 44:17
**minutes** [2] - 39:10, 44:15
**Minutes** [1] - 39:13
**misconduct** [1] - 27:15
**misheard** [1] - 7:7
**misleading** [1] - 36:14
**mistake** [1] - 33:22
**mistakes** [1] - 33:21
**Mitchell** [2] - 1:21, 58:14
**model** [1] - 33:20

**modified** [1] - 36:3
**mom** [3] - 31:15, 31:16, 33:4
**moment** [3] - 27:16, 48:11, 49:17
**Monday** [1] - 54:5
**money** [10] - 12:12, 19:11, 21:11, 28:23, 29:12, 30:21, 37:13, 45:10, 53:22, 53:24
**monitoring** [3] - 51:22, 51:23, 52:7
**Monroe** [1] - 31:14
**month** [5] - 20:13, 41:7, 50:1, 50:21, 55:25
**monthly** [1] - 52:23
**months** [17] - 6:21, 7:19, 9:18, 29:11, 34:22, 36:10, 49:15, 50:1, 50:3, 50:23, 51:15, 55:9, 55:10, 55:15, 56:3, 56:4
**moral** [1] - 27:19
**most** [4] - 11:11, 19:23, 32:10, 34:15
**mother** [4] - 22:10, 38:4, 43:19, 55:22
**motion** [3] - 6:14, 6:17, 6:24
**motions** [3] - 9:9, 9:11, 9:12
**motivation** [1] - 44:10
**mouths** [1] - 41:10
**move** [1] - 9:14
**movement** [2] - 40:4, 40:10
**moving** [1] - 7:10
**MR** [59] - 3:9, 3:13, 3:22, 3:25, 4:5, 4:21, 4:23, 6:9, 6:12, 6:18, 7:3, 7:9, 7:12, 7:17, 7:21, 7:23, 8:2, 8:4, 8:13, 8:16, 8:19, 9:8, 9:14, 9:17, 12:14, 12:17, 15:9, 15:19, 16:12, 16:21, 18:18, 18:21, 20:24, 21:3, 22:5, 22:15, 22:19, 23:20, 24:6, 24:10, 24:16, 44:14, 54:15, 54:20, 54:24, 55:4, 55:18, 55:20, 55:22, 56:8, 56:14, 56:16, 56:19, 57:2, 57:5, 57:10, 57:12, 58:2, 58:5
**mull** [1] - 44:16
**MURRAY** [35] - 1:15, 3:9, 3:22, 3:25, 4:5, 4:21, 6:9, 6:18, 7:9, 7:12, 7:21, 8:2, 8:13, 8:16, 9:8, 9:14, 9:17, 12:14, 12:17, 15:9, 15:19, 16:12, 16:21, 18:18, 18:21, 20:24, 21:3, 22:5, 22:15, 22:19, 23:20, 54:15, 55:4, 55:18, 58:5
**Murray** [13] - 3:9, 6:8, 6:14, 7:7, 7:20, 8:12, 8:23, 9:7, 24:19, 26:13, 28:23, 28:25, 35:20
**Murray's** [1] - 25:1

**must** [1] - 51:9
**nail** [1] - 15:13
**name** [2] - 38:25, 39:1
**Nation** [1] - 38:19
**nature** [8] - 10:3, 26:21, 27:1, 34:8, 34:24, 35:19, 38:12, 45:1
**necessarily** [2] - 18:7, 29:8
**necessary** [6] - 12:21, 17:5, 27:21, 28:6, 40:10, 42:1
**necessity** [1] - 45:5
**need** [15] - 5:11, 5:12, 8:8, 11:13, 15:21, 17:3, 18:3, 24:2, 29:7, 39:9, 40:13, 47:10, 47:20, 48:13, 55:17
**needed** [2] - 38:1, 47:17
**needs** [6] - 5:17, 5:19, 13:20, 15:22, 19:16, 21:25
**needy** [1] - 39:1
**negatives** [1] - 28:18
**neighbor** [1] - 42:24
**nephew** [3] - 22:17, 22:18, 22:19
**network** [4] - 10:22, 13:2, 22:23, 23:12
**never** [10] - 25:18, 27:12, 30:6, 33:11, 34:1, 42:6, 42:19, 43:23, 44:4
**New** [3] - 2:4, 27:9
**new** [1] - 52:25
**Newell** [1] - 32:24
**next** [2] - 18:18, 42:5
**niece** [5] - 22:11, 22:17, 22:18, 37:19
**night** [1] - 41:11
**nine** [1] - 56:4
**NO** [1] - 1:3
**nobody** [3] - 23:9, 30:17, 38:8
**North** [1] - 35:8
**note** [6] - 31:21, 45:17, 46:2, 50:6, 50:12, 57:16
**noted** [3] - 38:14, 47:8, 53:22
**nothing** [4] - 39:5, 43:22, 43:25, 45:11
**notice** [1] - 54:21
**noticing** [1] - 37:14
**notify** [1] - 53:13
**notion** [4] - 15:13, 16:5, 22:8, 54:3
**number** [6] - 8:14, 8:16, 13:23, 14:1, 22:9, 45:15
**numerous** [2] - 21:15, 21:20
**object** [1] - 23:20
**objected** [2] - 25:2, 54:2
**objection** [4] - 3:23, 6:19, 8:17, 25:1
**objections** [1] - 7:25
**objective** [1] - 25:12

**objects** [1] - 24:25
**obligated** [1] - 28:5
**obligation** [1] - 43:1
**obligations** [3] - 23:21, 53:4, 53:7
**obvious** [1] - 35:14
**obviously** [4] - 10:3, 10:23, 12:8, 22:20
**occurred** [1] - 40:20
**occurrence** [1] - 12:25
**occurring** [2] - 33:14, 41:18
**occurs** [1] - 53:15
**October** [1] - 28:21
**off-shore** [2] - 11:3, 11:7
**offense** [16] - 6:3, 6:4, 6:25, 7:4, 10:3, 14:7, 27:1, 29:12, 40:20, 45:2, 46:7, 46:8, 49:13, 50:8
**offenses** [2] - 41:14, 41:17
**Office** [3] - 51:16, 51:21, 52:19
**OFFICE** [1] - 1:14
**office** [3] - 3:10, 51:1, 52:21
**OFFICER** [2] - 55:7, 55:11
**officer** [5] - 51:11, 51:24, 52:4, 52:22, 53:2
**officers** [1] - 31:3
**Official** [2] - 1:22, 58:14
**often** [1] - 57:22
**Ohio** [3] - 11:4, 11:24, 38:14
**old** [1] - 37:17
**once** [1] - 33:12
**one** [37] - 4:22, 8:5, 8:22, 9:8, 9:10, 10:2, 11:8, 13:15, 18:2, 19:7, 19:22, 20:13, 20:24, 22:6, 25:5, 25:9, 25:18, 29:23, 34:6, 34:13, 35:25, 41:7, 43:1, 48:11, 50:1, 50:15, 50:21, 51:9, 55:12, 55:13, 55:15, 56:16
**One** [1] - 1:16
**ones** [1] - 36:23
**ongoing** [1] - 29:24
**open** [1] - 11:2
**opened** [1] - 38:25
**opening** [1] - 53:1
**opportunity** [5] - 9:5, 10:20, 42:11, 43:17, 44:11
**opposed** [1] - 19:3
**option** [3] - 20:19, 20:20, 23:10
**options** [4] - 12:19, 20:3, 20:9, 20:19
**order** [7] - 3:1, 35:24, 45:3, 46:11, 49:7, 50:1, 50:16
**ordered** [4] - 53:9, 53:17, 53:20, 54:4
**organizations** [1] - 43:15
**otherwise** [4] - 30:4, 41:1, 52:16, 53:7

**outcome** [1] - 57:14
**overall** [1] - 27:15
**overarching** [2] - 28:3, 28:4
**overcrowding** [1] - 40:5
**overwhelming** [1] - 32:11
**owes** [1] - 13:13
**own** [2] - 18:23, 30:1
**owned** [1] - 34:3
**owner** [1] - 13:13
**ownership** [1] - 11:6
**p.m** [6] - 1:9, 3:1, 44:18, 54:8, 58:6
**PA** [1] - 1:8
**paid** [8] - 8:19, 13:10, 32:19, 37:20, 38:3, 49:6, 53:12, 53:22
**pans** [1] - 32:16
**parent** [3] - 38:1, 38:2, 43:21
**parents** [1] - 32:9
**Parkinson's** [2] - 38:22, 38:23
**parsimony** [2] - 28:2, 41:24
**part** [5] - 12:2, 13:2, 23:18, 27:20, 46:18
**particular** [2] - 15:15, 50:6
**particularly** [4] - 13:19, 22:10, 47:10, 48:8
**parties** [1] - 8:21
**partner** [3] - 24:10, 42:23, 43:19
**party** [1] - 30:15
**path** [1] - 44:6
**Patrick** [1] - 3:9
**PATRICK** [1] - 1:15
**patrick.j.murray@usdoj. gov** [1] - 1:18
**pause** [1] - 12:7
**pay** [10] - 13:9, 13:15, 21:11, 29:4, 49:9, 52:6, 53:9, 53:17, 53:20
**paying** [4] - 13:18, 45:9, 49:19, 52:16
**payment** [1] - 53:3
**PC** [1] - 2:2
**peers** [1] - 17:13
**penalties** [1] - 52:16
**penalty** [1] - 12:13
**PENNSYLVANIA** [1] - 1:1
**Pennsylvania** [2] - 1:17, 21:19
**people** [34] - 12:2, 13:6, 19:3, 21:21, 22:23, 23:3, 25:23, 25:24, 26:1, 26:3, 26:4, 29:5, 30:2, 31:1, 31:14, 32:19, 32:22, 33:21, 34:2, 34:12, 34:18, 35:9, 37:3, 37:6, 37:11, 37:15, 38:7, 40:1, 40:18, 41:4, 44:8, 44:10

**percent** [5] - 39:20, 39:21, 39:22, 40:18
**percentage** [1] - 40:19
**perhaps** [5] - 10:24, 11:21, 19:16, 23:22, 35:22
**period** [4] - 51:15, 52:11, 55:14, 56:11
**permit** [1] - 51:24
**person** [9] - 22:25, 29:10, 29:14, 29:20, 37:7, 38:6, 40:23, 42:23, 50:25
**personal** [2] - 41:19, 45:23
**personally** [1] - 38:22
**perspective** [6] - 4:9, 4:12, 14:15, 14:16, 14:18, 55:19
**persuade** [1] - 16:9
**persuaded** [1] - 47:24
**pertaining** [1] - 52:14
**phenomenal** [1] - 10:21
**Philadelphia** [2] - 1:8, 1:17
**philosophies** [1] - 27:19
**phony** [3] - 36:1
**physical** [3] - 29:13, 35:5, 41:1
**physically** [2] - 23:2, 43:9
**picture** [3] - 22:20, 31:25, 32:2
**pieces** [1] - 17:16
**pipefitter** [1] - 31:15
**pizza** [1] - 13:13
**place** [2] - 46:9, 49:3
**placed** [1] - 50:22
**places** [1] - 46:11
**plainly** [1] - 27:20
**plan** [1] - 49:24
**plastic** [1] - 38:14
**play** [1] - 31:24
**pleaded** [2] - 33:13, 34:4
**pled** [1] - 10:6
**podium** [1] - 42:14
**point** [33] - 5:12, 5:16, 6:5, 6:6, 6:7, 6:15, 6:25, 9:21, 9:22, 15:5, 16:13, 16:14, 16:15, 16:22, 17:17, 17:23, 18:9, 18:22, 18:24, 20:24, 21:1, 21:4, 21:5, 24:24, 33:1, 34:19, 45:12, 45:13, 45:14, 47:20, 49:19
**pointed** [1] - 48:19
**points** [2] - 16:1, 16:23
**policy** [6] - 13:21, 15:11, 46:10, 48:10, 48:13, 48:15
**poor** [2] - 29:10, 38:18
**population** [4] - 39:20, 39:21, 39:22
**portable** [1] - 52:1
**portion** [2] - 31:6, 53:15
**position** [8] - 5:20, 9:17, 11:25, 12:19, 23:19, 24:20,

24:22, 57:23
**positions** [1] - 12:1
**positive** [1] - 44:8
**possess** [1] - 51:6
**possessing** [1] - 51:5
**possibilities** [2] - 18:11, 48:6
**possible** [2] - 28:9, 48:8
**pot** [1] - 32:15
**potential** [2] - 23:23, 47:7
**pots** [1] - 32:16
**practice** [1] - 57:20
**preliminary** [2] - 9:8, 47:9
**prepared** [2] - 1:24, 47:24
**present** [1] - 38:1
**presentations** [1] - 9:6
**presentence** [3] - 4:19, 6:3, 7:25
**pretrial** [1] - 54:11
**pretty** [1] - 33:7
**prevent** [1] - 47:12
**primary** [3] - 10:2, 11:21, 14:3
**principle** [2] - 27:17, 28:4
**principles** [2] - 42:22, 43:3
**priors** [1] - 7:13
**prison** [18] - 14:11, 20:4, 20:13, 21:6, 21:22, 22:2, 34:23, 35:7, 39:21, 39:23, 39:24, 47:21, 47:23, 49:18, 49:21, 49:22, 50:2, 54:5
**Prisons** [7] - 17:4, 48:2, 50:20, 50:25, 54:7, 56:7, 56:12
**Prisons'** [2] - 17:20, 47:25
**private** [1] - 57:20
**probation** [42] - 3:19, 7:7, 12:20, 13:5, 14:10, 14:23, 15:2, 16:15, 16:17, 20:8, 20:14, 20:20, 21:5, 21:10, 24:25, 25:5, 28:12, 29:14, 30:17, 30:19, 30:25, 31:3, 31:6, 36:6, 36:13, 36:24, 40:8, 40:14, 40:24, 41:2, 41:7, 41:9, 41:14, 42:4, 48:7, 51:1, 51:11, 51:24, 52:4, 52:21, 52:22, 53:2
**Probation** [4] - 30:24, 51:16, 51:21, 52:19
**PROBATION** [2] - 55:7, 55:11
**probationary** [1] - 31:11
**problem** [4] - 21:12, 26:7, 34:12, 56:25
**problems** [2] - 34:9
**procedures** [1] - 51:23
**proceed** [1] - 3:25
**proceeding** [2] - 4:3, 12:4
**proceedings** [1] - 58:11
**Proceedings** [2] - 1:24, 58:6
**professional** [2] - 21:10,

45:23
**programs** [1] - 51:19
**progressive** [2] - 46:10, 46:14
**prohibited** [2] - 51:5, 52:25
**prominent** [3] - 11:23, 11:24, 13:7
**promote** [1] - 46:7
**pronounce** [1] - 50:17
**properly** [1] - 52:11
**prosecutions** [1] - 14:1
**prosecutor** [1] - 24:18
**protecting** [1] - 47:14
**provide** [7] - 17:5, 17:10, 17:13, 46:8, 47:17, 52:18, 52:23
**provided** [2] - 10:17, 17:22
**public** [3] - 32:13, 33:15, 47:14
**punished** [2] - 29:15, 35:22
**punishing** [1] - 41:22
**punishment** [9] - 10:12, 14:19, 21:7, 31:12, 39:6, 42:20, 46:8, 46:18, 49:19
**purposes** [1] - 16:16
**pursuant** [1] - 50:18
**put** [16] - 8:8, 26:24, 27:11, 31:20, 31:25, 34:8, 34:25, 35:7, 35:8, 35:15, 37:21, 40:8, 40:10, 40:14, 57:1, 57:8
**puts** [1] - 49:14
**putting** [2] - 7:14, 34:23
**qualities** [1] - 45:16
**questions** [3] - 5:9, 22:4, 26:13
**quickly** [2] - 7:10, 35:4
**quit** [1] - 38:3
**quite** [2] - 25:3, 25:22
**quote** [1] - 28:5
**quotes** [1] - 13:23
**Racha** [5] - 24:10, 30:13, 34:6, 34:8, 43:19
**raised** [2] - 18:16, 26:13
**raising** [1] - 38:19
**Rakoff** [3] - 27:9, 27:13, 45:25
**range** [15] - 6:21, 9:18, 9:24, 19:6, 23:24, 24:1, 29:10, 34:21, 36:4, 41:6, 41:14, 48:6, 48:18, 49:2, 50:1
**ranges** [3] - 20:1, 36:3, 49:1
**rather** [2] - 30:25, 39:1
**RDR** [2] - 1:21, 58:14
**read** [6] - 5:3, 27:7, 27:8, 27:12, 42:9, 48:22
**reading** [1] - 6:4
**real** [1] - 12:25
**realize** [1] - 41:15

**realizes** [1] - 33:21
**really** [14] - 14:9, 14:17, 14:24, 21:3, 26:5, 27:10, 27:11, 40:6, 40:7, 46:21, 47:19, 49:8, 57:15, 57:19
**reason** [6] - 4:12, 11:10, 25:8, 25:16, 46:9
**reasonable** [1] - 36:25
**reasons** [3] - 19:17, 24:23, 35:14
**receive** [2] - 11:3, 27:14
**receiving** [2] - 21:7, 41:20
**recently** [1] - 39:13
**recess** [1] - 44:17
**Recess** [1] - 44:18
**recidivism** [1] - 15:16
**recognition** [1] - 14:5
**recognize** [1] - 22:21
**recommend** [4] - 49:14, 56:19, 56:20, 56:24
**recommendation** [4] - 56:23, 57:1, 57:8
**recommended** [1] - 7:19
**record** [10] - 3:18, 6:2, 6:24, 8:7, 8:8, 54:16, 54:19, 57:1, 57:9, 58:11
**records** [1] - 52:19
**redeeming** [1] - 45:15
**reduction** [1] - 6:6
**Reed** [1] - 38:17
**reference** [2] - 46:16, 48:11
**referenced** [1] - 17:11
**references** [2] - 48:23, 49:5
**referred** [1] - 9:24
**Reform** [1] - 50:18
**regard** [2] - 45:19
**regarding** [4] - 15:25, 26:13, 28:12, 34:13
**registry** [2] - 49:7, 53:23
**regret** [4] - 43:5, 43:6, 43:10, 43:24
**regretful** [1] - 43:13
**rehabilitation** [1] - 34:11
**rehabilitation-related** [1] - 34:11
**related** [4] - 25:13, 34:11, 38:24, 47:12
**relative** [1] - 14:1
**relatively** [1] - 45:10
**release** [11] - 50:2, 50:3, 50:21, 50:23, 50:24, 51:3, 51:10, 52:11, 55:8, 55:12, 55:14
**released** [1] - 51:2
**relevant** [4] - 10:8, 11:14, 13:24, 48:15
**relies** [1] - 31:17
**religions** [1] - 27:19
**religious** [1] - 51:18

**reluctant** [1] - 31:22
**remain** [1] - 54:9
**remains** [1] - 53:16
**remarkable** [3] - 26:10, 38:11, 45:18
**reminded** [1] - 8:7
**remorse** [1] - 34:1
**remorseful** [1] - 33:11
**remove** [2] - 39:4, 39:5
**report** [13] - 4:20, 4:25, 5:9, 5:15, 6:4, 7:7, 8:1, 8:10, 8:13, 50:25, 52:12, 54:3, 54:6
**Reporter** [2] - 1:22, 58:14
**reporting** [1] - 23:19
**reports** [1] - 36:1
**represent** [2] - 17:8, 57:22
**Representing** [2] - 1:19, 2:6
**representing** [1] - 29:17
**request** [4] - 8:25, 41:8, 41:12, 52:20
**require** [1] - 6:14
**required** [1] - 51:16
**requirement** [1] - 53:11
**requirements** [1] - 57:4
**requires** [1] - 52:5
**research** [10] - 14:11, 14:13, 14:15, 14:20, 14:23, 16:2, 16:4, 16:13, 16:17, 17:16
**residence** [5] - 51:14, 51:17, 51:25, 52:1, 53:15
**resources** [7] - 10:23, 13:9, 17:6, 21:16, 21:19, 21:23, 23:3
**respect** [12] - 9:21, 10:12, 13:3, 16:24, 17:23, 18:23, 22:16, 23:21, 23:25, 24:20, 46:7, 48:12
**respectable** [1] - 44:6
**respected** [1] - 27:10
**respectfully** [5] - 24:21, 28:11, 36:17, 41:17, 41:22
**RESPONSE** [1] - 3:4
**responsibility** [1] - 6:6
**rest** [3] - 20:4, 20:13, 43:10
**restitution** [9] - 8:9, 13:10, 16:22, 21:11, 49:4, 49:6, 53:4, 53:7, 53:21
**restriction** [1] - 31:12
**restrictive** [1] - 31:2
**result** [10] - 7:13, 14:23, 15:23, 19:20, 22:1, 22:25, 39:25, 45:18, 46:3, 46:19
**resulting** [1] - 6:20
**results** [1] - 49:14
**resume** [1] - 57:18
**retained** [1] - 19:1
**retired** [1] - 21:9
**retires** [1] - 33:1

**return** [2] - 10:7, 28:22
**returns** [4] - 52:9, 52:10, 52:13, 52:20
**revenue** [1] - 46:13
**Revenue** [4] - 52:9, 52:14, 53:21, 53:24
**review** [1] - 4:25
**revisions** [1] - 4:20
**rich** [1] - 35:21
**rights** [2] - 54:13, 54:18
**risk** [5] - 15:16, 16:5, 46:21, 47:5, 47:6
**risks** [3] - 34:22, 34:24, 47:4
**RMR** [2] - 1:21, 58:14
**road** [1] - 31:25
**robbery** [1] - 39:14
**Robinson** [1] - 36:9
**role** [1] - 33:20
**room** [1] - 38:2
**routinely** [2] - 37:23
**Rubbermaid** [1] - 32:24
**runs** [1] - 22:7
**sane** [1] - 31:9
**Santella** [2] - 3:18, 55:6
**saw** [2] - 5:16, 33:19
**scale** [1] - 29:9
**scales** [1] - 27:24
**schedules** [1] - 53:3
**scheme** [1] - 45:4
**Schnatz** [1] - 3:20
**scholarship** [1] - 38:25
**school** [2] - 32:13, 37:21
**score** [2] - 7:8, 7:16
**screwed** [1] - 29:2
**seated** [5] - 3:3, 3:14, 4:17, 5:23, 44:19
**second** [2] - 27:7, 46:6
**Section** [2] - 44:22, 50:6
**securities** [1] - 18:6
**security** [3] - 18:1, 18:5, 18:8
**see** [4] - 12:9, 32:6, 33:13, 48:17
**seem** [1] - 15:18
**sees** [1] - 34:12
**self** [2] - 23:19, 54:3
**self-report** [1] - 54:3
**self-reporting** [1] - 23:19
**selfish** [1] - 43:21
**selfishly** [1] - 43:4
**send** [1] - 13:6
**sending** [1] - 33:14
**sense** [2] - 14:14, 14:16
**sentence** [47] - 7:19, 9:18, 9:23, 12:6, 12:9, 13:5, 14:5, 14:10, 15:23, 16:6, 16:18, 19:19, 20:12, 21:25, 23:19, 25:20, 25:24, 26:19, 27:6, 28:5, 28:9, 28:13, 31:11, 34:14, 34:24, 39:8, 39:25,

41:7, 42:4, 43:8, 44:16, 47:2, 47:3, 47:7, 47:12, 49:14, 49:16, 49:22, 50:2, 50:17, 54:5, 54:8, 54:12, 54:21, 54:25, 55:24, 56:1
**sentenced** [3] - 21:21, 21:22, 37:8
**sentences** [7] - 14:16, 14:17, 19:16, 21:18, 36:24, 41:20, 48:4
**Sentencing** [1] - 50:18
**sentencing** [32] - 6:22, 8:23, 9:20, 9:23, 9:25, 11:22, 12:3, 13:15, 13:23, 15:21, 16:1, 18:17, 21:16, 22:7, 22:13, 23:4, 27:16, 27:21, 28:4, 28:7, 28:11, 31:23, 39:15, 41:13, 41:24, 42:1, 44:20, 44:22, 48:9, 48:25, 49:5, 53:12
**SENTENCING** [1] - 1:5
**sentencings** [1] - 19:24
**Serafini** [1] - 36:7
**serious** [6] - 10:5, 10:10, 34:22, 35:11, 40:11, 46:8
**seriously** [3] - 29:23, 30:2, 31:4
**seriousness** [1] - 46:7
**served** [1] - 14:9
**service** [6] - 28:13, 40:15, 45:16, 51:18, 53:6, 54:8
**Service** [4] - 52:9, 52:14, 53:21, 53:25
**services** [4] - 38:15, 51:18, 52:1, 54:11
**set** [1] - 44:21
**setting** [1] - 37:2
**seven** [6] - 31:15, 50:3, 51:15, 55:9, 55:15, 56:3
**several** [4] - 16:23, 17:16, 29:25, 43:6
**severity** [3] - 47:2, 47:3, 47:6
**shall** [22] - 50:22, 50:25, 51:3, 51:4, 51:6, 51:12, 51:16, 51:22, 51:24, 52:3, 52:6, 52:18, 52:21, 52:23, 53:5, 53:9, 53:12, 53:13, 53:17, 53:19, 53:20
**shame** [4] - 13:3, 13:5, 21:13, 43:24
**shamed** [1] - 12:24
**share** [1] - 42:25
**shoes** [1] - 47:5
**shore** [2] - 11:3, 11:7
**shot** [1] - 25:3
**show** [1] - 19:19
**shown** [1] - 33:2
**shows** [2] - 14:11, 41:4
**shy** [1] - 43:23
**side** [1] - 12:8

**sides** [1] - 24:19
**significant** [11] - 14:8, 23:12, 31:12, 32:15, 36:8, 41:2, 47:2, 47:21, 49:21, 49:22
**significantly** [1] - 35:13
**silly** [1] - 32:20
**similar** [3] - 19:5, 19:6, 41:14
**similarly** [1] - 19:2
**simply** [1] - 41:23
**sincere** [1] - 44:2
**sincerely** [1] - 43:24
**single** [1] - 19:4
**sister** [1] - 31:18
**situated** [1] - 19:2
**situation** [10] - 13:16, 14:21, 20:15, 23:10, 23:13, 24:1, 31:3, 37:7, 40:16
**situations** [1] - 36:19
**six** [4] - 28:22, 40:20, 41:4, 41:6
**slap** [2] - 30:24, 31:11
**sleep** [1] - 41:10
**slightly** [1] - 13:11
**small** [3] - 45:10, 47:7, 49:17
**smartest** [1] - 25:14
**societal** [1] - 15:11
**societally** [1] - 16:11
**society** [2] - 15:11, 41:22
**someone** [5] - 31:18, 34:19, 37:21, 40:8, 47:5
**somewhat** [1] - 24:13
**son** [7] - 22:11, 22:19, 24:12, 33:12, 33:15, 37:22, 39:1
**sophisticated** [2] - 6:5, 45:4
**sorry** [4] - 7:9, 14:15, 43:16, 54:17
**sort** [9] - 6:1, 9:4, 11:16, 15:17, 23:18, 45:3, 48:8, 48:18, 57:18
**spares** [1] - 39:9
**speaks** [1] - 32:2
**special** [3] - 31:19, 51:13, 53:18
**specific** [6] - 11:18, 15:21, 15:25, 28:11, 46:24, 52:3
**specifically** [3] - 13:24, 40:17, 51:20
**spend** [1] - 30:20
**spoken** [1] - 9:21
**stability** [2] - 33:3, 40:12
**stand** [3] - 46:4, 46:5, 58:4
**standard** [1] - 51:7
**standing** [4] - 42:19, 45:19, 46:2, 46:4
**standpoint** [1] - 49:20
**start** [3] - 3:7, 4:18, 7:24
**started** [2] - 15:7, 38:18
**starting** [1] - 9:22
**stat** [1] - 55:11

state [1] - 51:4
statement [1] - 28:22
statements [6] - 13:21, 17:4, 48:10, 48:13, 48:15, 52:23
STATES [2] - 1:1, 1:3
States [12] - 1:19, 3:5, 10:10, 11:25, 39:16, 39:19, 39:25, 52:17, 52:18, 53:10, 53:13, 53:18
statistical [2] - 18:23, 25:11
statistically [1] - 40:17
statistics [1] - 39:19
statute [1] - 26:17
stay [1] - 39:5
stays [1] - 20:2
steal [1] - 30:18
stealing [1] - 10:9
stenographically [1] - 1:24
Step [1] - 57:3
step [2] - 23:1, 42:13
stepped [1] - 23:1
still [1] - 31:16
stood [3] - 23:21, 43:20, 47:8
store [1] - 13:13
straight [2] - 20:12, 20:20
Street [2] - 1:7, 1:16
strenuously [1] - 15:1
stress [2] - 35:13, 43:24
strong [2] - 22:23, 48:17
structured [1] - 47:12
studies [1] - 34:25
study [2] - 35:1, 39:25
stuff [2] - 33:17, 37:5
stupid [3] - 29:5, 29:6, 32:21
subcontractors [1] - 35:25
subject [1] - 34:2
submit [8] - 11:9, 13:11, 14:12, 21:14, 22:22, 40:16, 40:19, 51:9
submits [2] - 10:11, 21:23
submitted [4] - 8:24, 10:16, 21:21, 42:10
submitting [1] - 10:7
subsequent [1] - 55:2
substance [1] - 51:6
substantial [2] - 13:9, 36:14
substantially [2] - 25:4, 36:22
success [2] - 37:15, 42:25
sufficient [8] - 12:14, 13:1, 15:4, 21:6, 28:6, 28:8, 28:10, 41:25
sufficiently [1] - 24:2
suggested [1] - 14:9
Suite [2] - 1:16, 2:4
supervised [9] - 50:2, 50:3, 50:22, 51:3, 51:10, 52:11, 55:8, 55:12, 55:14
support [5] - 20:20, 23:8,

23:12, 43:19, 46:12
supported [1] - 45:22
Supreme [2] - 9:20, 30:23
surely [1] - 27:13
surgeon [1] - 38:14
surprised [1] - 24:25
surrender [1] - 56:1
surrogate [1] - 37:20
survivor [1] - 31:17
suspended [1] - 54:5
Swiss [1] - 11:2
sympathetic [1] - 57:23
symposium [2] - 39:11, 39:18
system [3] - 17:21, 19:3, 40:1
systems [2] - 17:19, 27:19
table [1] - 6:22
tables [1] - 48:9
talents [1] - 40:14
talks [4] - 38:14, 38:17, 38:21, 50:12
Taste [1] - 38:18
taught [6] - 32:9, 32:13, 33:4, 37:22, 42:22, 43:3
tax [19] - 10:5, 10:7, 12:6, 13:25, 14:1, 14:3, 14:6, 25:2, 25:4, 26:6, 28:22, 36:2, 46:9, 46:10, 47:12, 48:14, 52:17, 52:20
tax-related [1] - 47:12
taxable [1] - 52:12
taxation [1] - 46:14
taxes [5] - 32:19, 32:22, 36:11, 45:9, 52:16
taxpayers [2] - 10:9, 12:13
teaching [1] - 17:15
technical [3] - 5:24, 6:13, 49:7
technically [1] - 6:14
telephone [1] - 51:25
temper [1] - 42:2
tempted [1] - 12:5
ten [1] - 24:11
tended [1] - 57:22
term [7] - 23:18, 28:13, 47:21, 50:21, 50:23, 55:7, 56:6
terms [3] - 15:21, 54:10, 54:12
test [1] - 51:9
tests [1] - 51:11
The court [118] - 3:2, 3:5, 3:12, 3:16, 3:23, 4:2, 4:6, 4:9, 4:15, 4:17, 4:22, 4:24, 5:2, 5:5, 5:8, 5:11, 5:15, 5:19, 5:23, 6:11, 6:13, 6:23, 7:4, 7:11, 7:15, 7:18, 7:22, 7:24, 8:3, 8:5, 8:7, 8:15, 8:18, 8:20, 9:13, 9:16, 10:1,

12:11, 12:16, 12:19, 13:11, 13:20, 15:5, 15:10, 15:22, 16:4, 16:20, 17:18, 18:9, 18:15, 18:20, 19:24, 20:1, 20:6, 20:11, 20:15, 20:19, 20:22, 21:1, 22:4, 22:6, 22:18, 22:22, 23:15, 23:21, 24:4, 24:7, 24:8, 24:9, 24:14, 25:2, 25:8, 25:10, 26:17, 26:18, 26:25, 27:3, 27:5, 28:9, 31:5, 32:1, 32:6, 36:4, 36:7, 36:20, 37:3, 39:8, 42:8, 42:17, 44:12, 44:15, 44:19, 46:5, 50:19, 53:8, 53:10, 53:23, 54:1, 54:17, 54:23, 55:5, 55:9, 55:13, 55:19, 55:21, 55:25, 56:6, 56:9, 56:15, 56:18, 56:25, 57:3, 57:7, 57:11, 57:13, 58:3
theft [2] - 12:12, 13:8
thereafter [1] - 51:11
therefore [1] - 35:22
they've [3] - 26:4, 37:12, 43:25
thinking [2] - 15:12, 33:16
thinks [1] - 6:19
Third [9] - 25:3, 36:5, 36:9, 36:12, 36:17, 36:24, 41:4, 48:23, 48:24
third [4] - 6:7, 6:15, 6:24, 50:15
thoughts [1] - 44:24
thousands [1] - 38:19
three [6] - 5:4, 23:7, 30:19, 32:13, 33:8, 36:11
three-and-a-half [1] - 33:8
throughout [3] - 11:25, 21:18, 23:1
tight [1] - 10:22
timely [1] - 52:10
today [9] - 4:7, 4:13, 10:10, 24:22, 43:2, 43:19, 44:2, 44:11, 44:20
Todd [1] - 38:21
Toledo [2] - 38:16, 38:20
Tomko [2] - 35:23
took [4] - 29:12, 32:15, 37:19, 37:20
tooth [1] - 15:13
torment [1] - 40:25
total [4] - 6:3, 7:4, 50:15, 53:18
touch [1] - 54:10
touched [1] - 45:21
trained [1] - 37:12
training [2] - 47:18, 51:19
transcript [1] - 58:10
transcription [1] - 1:24
transfer [1] - 53:24
travel [1] - 31:1

treat [1] - 29:7
treated [3] - 21:24, 29:8, 29:16
treating [1] - 26:15
treatment [3] - 34:15, 47:19, 47:23
trend [1] - 41:18
trial [2] - 39:12, 48:20
tribulations [1] - 45:23
tried [4] - 34:4, 42:22, 42:23, 43:23
tries [2] - 34:12, 34:17
trouble [1] - 30:22
true [1] - 10:1
truly [2] - 33:10, 38:11
trust [1] - 11:3
truthful [1] - 52:23
truthfully [1] - 45:20
try [2] - 30:8, 47:12
trying [3] - 31:24, 32:11, 32:12
turn [1] - 44:7
two [10] - 6:5, 6:6, 20:2, 22:4, 31:14, 36:10, 39:12, 49:13, 50:14, 51:10
two-point [2] - 6:5, 6:6
type [13] - 12:5, 12:17, 12:21, 13:7, 15:2, 19:14, 19:20, 20:10, 24:3, 31:12, 33:16, 34:7, 38:6
types [3] - 41:14, 41:16, 47:11
U.S [2] - 1:7, 1:14
U.S.C [1] - 44:22
ultimate [1] - 21:4
ultimately [4] - 11:1, 12:19, 20:18, 23:25
under [3] - 30:3, 30:19, 41:24
underlied [1] - 16:14
underlying [1] - 14:3
undermine [2] - 12:10, 24:2
understandable [1] - 12:25
understandably [1] - 12:24
understood [2] - 16:20, 24:4
undo [1] - 44:5
unfortunately [1] - 29:4
uninsured [1] - 38:16
unique [1] - 38:11
UNITED [2] - 1:1, 1:3
United [12] - 1:19, 3:5, 10:9, 11:25, 39:16, 39:19, 39:25, 52:17, 52:18, 53:10, 53:13, 53:18
unless [4] - 3:23, 53:2, 53:6, 58:3
unnecessary [2] - 40:5, 41:23
unpaid [1] - 53:16
unusual [1] - 56:22

**unwarranted** [1] - 19:20
**up** [28] - 6:25, 9:3, 11:4, 11:7, 11:16, 19:14, 19:25, 23:1, 23:17, 29:3, 32:11, 33:1, 33:7, 34:3, 36:7, 37:2, 37:25, 38:2, 38:25, 39:14, 42:13, 42:21, 43:3, 48:22, 57:13
**upheld** [4] - 36:5, 36:9, 36:12, 36:24
**upward** [6] - 9:3, 28:16, 42:5, 50:4, 50:9, 50:16
**urge** [4] - 28:11, 41:17, 41:23, 42:2
**US** [9] - 3:10, 28:3, 30:3, 30:20, 30:23, 44:3, 51:15, 51:20, 54:7
**usual** [1] - 9:23
**utilizing** [1] - 1:24
**variance** [7] - 9:1, 20:7, 36:5, 36:10, 36:12, 36:16, 49:11
**variation** [1] - 36:14
**varies** [1] - 20:6
**variety** [3] - 37:5, 44:21, 44:23
**various** [3] - 10:19, 12:1, 48:13
**vary** [3] - 12:19, 20:2, 49:12
**varying** [2] - 12:20, 19:14
**vast** [1] - 19:3
**verbalize** [1] - 43:5
**versus** [1] - 14:17
**victims** [1] - 34:7
**vigorous** [1] - 25:1
**vigorously** [3] - 24:20, 24:21, 25:3
**vigorousness** [1] - 29:19
**violating** [1] - 14:2
**violations** [1] - 14:2
**violators** [1] - 14:7
**violent** [1] - 35:10
**virtual** [1] - 29:25
**virtually** [1] - 18:13
**visit** [1] - 38:5
**visits** [1] - 56:22
**visualize** [1] - 32:2
**vocational** [1] - 47:18
**waded** [1] - 48:20
**waive** [1] - 53:10
**walk** [1] - 44:24
**wants** [1] - 31:9
**warehouse** [1] - 40:13
**warehousing** [2] - 40:6, 41:16
**warm** [1] - 42:3
**warranted** [4] - 9:19, 12:21, 22:3, 50:10
**watching** [2] - 12:4, 40:23
**water** [1] - 42:16
**ways** [1] - 26:4

**wealth** [1] - 45:7
**wealthiest** [1] - 46:11
**wealthy** [3] - 29:7, 29:16, 35:24
**wear** [1] - 51:22
**weigh** [1] - 27:25
**weighing** [1] - 27:18
**whole** [2] - 35:19, 37:5
**wholly** [1] - 36:25
**wife** [4] - 23:5, 23:8
**willfully** [1] - 10:7
**Williams** [1] - 3:10
**WILLIAMS** [1] - 1:15
**willing** [1] - 57:1
**wind** [4] - 6:25, 23:17, 48:22
**wish** [1] - 57:15
**withdrawals** [1] - 11:5
**withdrawing** [1] - 19:11
**withdrew** [1] - 28:23
**woke** [1] - 38:2
**WOLSON** [1] - 1:11
**wonderful** [2] - 22:24, 42:21
**word** [1] - 33:22
**word's** [1] - 39:21
**words** [3] - 27:11, 32:2, 36:15
**works** [3] - 31:19, 45:18, 57:16
**world** [2] - 29:9, 39:22
**world's** [1] - 39:20
**worldwide** [1] - 39:21
**worth** [2] - 34:23, 46:4
**worthy** [1] - 45:17
**would-be** [1] - 14:7
**wowie** [1] - 30:17
**wrap** [1] - 57:13
**wreck** [1] - 30:14
**wrist** [2] - 30:24, 31:11
**wrongs** [1] - 44:5
**wrote** [1] - 37:11
**year** [4] - 30:25, 55:12, 55:13, 55:15
**yearly** [1] - 52:20
**years** [17] - 14:18, 24:11, 24:17, 24:18, 28:22, 29:25, 30:19, 31:15, 32:8, 32:14, 33:8, 36:11, 39:12, 40:20, 42:5, 43:6
**York** [3] - 2:4, 27:9
**young** [3] - 23:7, 32:3, 39:14
**yourself** [2] - 45:14, 57:24
**zealousness** [1] - 29:19
**Zone** [10] - 6:21, 7:14, 7:19, 12:20, 20:1, 20:7, 20:8, 20:9, 20:15, 49:14